DIMMEN DEN BLEYKER v. FRANK D. GASTON AND ARTHUR B. GASTON.

*Sale—Breach of contract—Damages.*

1. The general rule that the measure of damages for the breach of a contract to sell and deliver personal property is the difference between the contract price, and the market price at the

time and place of the promised delivery, does not apply where the article contracted for is not kept for sale in the market, or is prepared for a special purpose.[1]

2. Lumber of a particular grade, cut into strips for a special purpose, cannot be said to have a market price; but its value ought not to be determined by taking lumber of a lower grade, and rejecting as waste all which does not conform to the required grade.

3. The measure of damages for the breach of a contract to sell and deliver 500,000 feet of rock elm strips in sets, consisting of a given number of pieces of prescribed sizes, lengths, and quality, from which to manufacture buggy shafts, is the difference between the contract price and the value of the material not supplied, the latter to be arrived at, where no substitute was procured, through persons qualified to judge, by determining what strips similar in kind, quality, and amount, cut from the log, would have cost or would have been worth at that time and place.

Error to Kalamazoo. (Buck, J.) Submitted on briefs June 9, 1893. Decided November 10, 1893.

*Assumpsit.* Defendants bring error. Reversed. The facts are stated in the opinions.

*Osborn & Mills,* for appellants.

*Allen M. Stearns,* for plaintiff.

McGRATH, J. Plaintiff and one McNabb, doing business at Kalamazoo as the Peninsular Carriage Company, on February 28, 1890, entered into a written contract with Arthur B. and Frank D. Gaston, partners, doing business as the Gaston Lumber Company, by the terms of which the latter agreed to furnish, f. o. b. cars at Kalamazoo, at a stated price per foot, 500,000 feet of rock elm strips in sets, consisting of a given number of pieces of sizes and lengths prescribed, all to be strictly clear, sound, and tough timber. The purchasers were given the option of varying the sizes at the same rate per foot. The lumber was to

---

[1] See *Ruppel v. Manufacturing Co.,* 96 Mich. 455.

be delivered, 25,000 feet in March, and 50,000 feet each month thereafter until the full amount should be furnished. In December, 1890, after 156,614 feet had been delivered, by supplemental agreement the monthly shipments were reduced to 20,000 feet. The Gastons thereafter furnished but 43,342 feet. In December, 1891, McNabb assigned his interest in the business to plaintiff, and in February, 1892, this action was brought for a breach of the contract. Plaintiff recovered a judgment of $1,775. Each party claimed that the other had broken the contract, and on the 1st day of June, 1891, defendants notified plaintiff that they regarded the contract as at an end.

The principal contention arises as to the rule of damages. Plaintiff seems to have been the only manufacturer who used rock elm in the manufacture of buggy shafts, and he testified that strips of the kind contracted for were not to be had in the market at Kalamazoo, or elsewhere; that he made diligent inquiry at a number of points and of a large number of parties, and was unable to find such strips in stock, or to procure them to be manufactured; that it is an unusual thing to make these shafts of rock elm; that it is usual to make them of hickory, but hickory costs more than rock elm; that hickory cannot be obtained in Michigan fit to make shafts; that the market value of what they call "mill-run lumber" is $16 per thousand, delivered in Kalamazoo; and "I have taken four car-loads according to their merchantable scale, and found the number of shafts it made, and figured up the number of feet it took to make the shafts out of merchantable lumber, and arrived at the difference in the cost in that way." The mill lumber would run to waste, so that a thousand feet of mill lumber would make but 520 feet of strips, making a thousand feet of strips cost $14.61 more than the contract price.

The general rule in cases to recover damages for the

breach of such a contract is that the difference between the market price of the goods at the time and place specified in the contract for delivering the same, and the contract price, is the measure of damages. But this rule presupposes that the vendee may go into the market and purchase the goods. If no such goods can be obtained, there can be no such thing as a market price by which to measure the purchaser's damages. *Hinde v. Liddell*, L. R. 10 Q. B. 265; *Colliery Co. v. Lever*, 9 Ch. Div. 20, 41 L. T. N. S. 633, 43 Id. 706; *Auger v. Cook*, 39 Up. Can. Q. B. 537; *Cockburn v. Lumber Co.*, 13 Ont. 343; *Houser v. Pearce*, 13 Kan. 104; *Hobbs v. Davis*, 30 Ga. 423; *Shepard v. Gas Light Co.*, 15 Wis. 318; *Richardson v. Chynoweth*, 26 Id. 656; *Cockburn v. Lumber Co.*, 54 Id. 619; *Bank v. Reese*, 26 Penn. St. 143; *McHose v. Fulmer*, 73 Id. 365. The rule contended for by defendants is inapplicable in all cases where the commodity contracted for is not kept for sale in the market, or where, as in the present case, the article is prepared for a special purpose. Lumber has a market price, but lumber of a particular grade, cut into strips for a special purpose, cannot be said to have such market price. Lumber is, however, an article of common use, and its market price is so well established that it ought not to be difficult to determine its value in any shape at any point. The value, however, of lumber of a particular grade, cut into strips, ought not to be determined by taking lumber of a lower grade, and rejecting as waste all which does not conform to the required grade. A shingle or a lath may be of clear stuff, but the value of either is not to be determined by cutting uppers into either, or by cutting up mill-run lumber, and rejecting all that does not come up to that grade.

Here plaintiff bought four car-loads of mill stuff, and had it cut into strips, rejecting 48 per cent. as waste, and utilizing but 52 per cent., and now seeks to recover, upon

that basis of cost, damages for failure to furnish 300,000 feet. It does not appear why plaintiff did not select lumber of the grade named in the contract. In cutting the strips from the log, the experienced sawyer would probably have saved the 48 per cent. Plaintiff was justified in avoiding, so far as he could, the consequences of the breach, and in procuring the most available substitute in the manner open to him; indeed, it was his duty so to do; but it does not here appear that the demands of his business, or the situation of the lumber market, compelled or required him to procure the substitute in the manner procured. The difference between the cost of the strips substituted and the contract price would be the measure of damages only so far as such substitution was actually and in good faith made. If plaintiff's business was interrupted by reason of his inability to procure materials, another rule of damages would necessarily be resorted to; but the value of the material not supplied, and for which no substitute was procured, must be arrived at through persons qualified to judge, by determining what strips similar in kind, quality, and amount, cut from the log, would have cost or would have been worth at that time and place.

The judgment must therefore be reversed, and a new trial ordered.

LONG and GRANT, JJ., concurred with McGRATH, J.

HOOKER, C. J. (dissenting). If, as I understand from the record, the uncontradicted evidence tended to show that it was impossible to procure the lumber of the required dimensions in the market, or to get it manufactured in any other way than to purchase rough lumber from which to manufacture it, though it cut to waste, the cost of so obtaining it might be the proper measure of damages.

I think the judgment should be affirmed.

MONTGOMERY, J., concurred with HOOKER, C. J.