CHARLES F. DUNBAR, Appellant, vs. WARREN SPRINGER
et al. Appellees.

*Opinion filed October 26, 1912—Rehearing denied Dec. 4, 1912.*

1. DEBTOR AND CREDITOR—*when creditor's failure to understand escrow agreement is not material.* The failure of a creditor to understand the terms of a settlement agreement at the time he delivered in escrow certain notes he held against the debtor is not material, if he subsequently expressly ratified the agreement and authorized a settlement on that basis.

2. TENDER—*tender, to be good, must be unconditional.* A tender, to be good, must be for a specific amount and must be offered without annexing any terms or conditions.

3. EQUITY—*when complainant is not entitled to a decree for amount offered by defendant.* Where the complainant in a bill to set aside a settlement agreement with his debtor refuses to accept an offer of a certain sum in cash provided he would assign a specified portion of the interest he had received in land over and above what he was entitled to under the settlement agreement, he is not entitled to a decree for such amount without assigning such interest, upon the theory that it was admitted to be due.

APPEAL from the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding.

GEORGE W. SPUNNER, and HAYDEN N. BELL, for appellant.

DOUGLAS C. GREGG, for appellee Marguerite Springer, executrix;—SEYMOUR EDGERTON, and THOMAS W. PRINDEVILLE, for appellee Thomas Brougham;—CHARLES L. BARTLETT, and SHERMAN C. SPITZER, for appellee the Chicago Title and Trust Company.

Mr. JUSTICE CARTER delivered the opinion of the court:

On March 18, 1908, appellant filed a bill in the superior court of Cook county against appellees, Warren Springer, James B. Brougham and the Chicago Title and Trust Com-

pany, the objects of which were (1) to set aside the settlement of appellant with Springer involving an escrow agreement dated November 30, 1904; (2) to revive the notes representing appellant's claim which had been canceled by the Chicago Title and Trust Company under said escrow agreement; (3) to have delivered up for cancellation the release of appellant's claim against Springer which the Chicago Title and Trust Company had delivered to him; (4) to obtain a personal decree against appellees for the amount of the appellant's claim,—against Springer as upon the original claim revived, against Brougham upon his agreement in writing with Springer to pay appellant's claim, among others, and against the Chicago Title and Trust Company for its alleged improper cancellation of appellant's trust notes. Answers were filed by the several defendants, and after an extended hearing before the chancellor the bill was dismissed for want of equity. On appeal to the Appellate Court for the First District the decree was affirmed and a certificate of importance granted. This appeal followed.

The facts as shown by the record are somewhat complicated. December 26, 1903, appellant loaned Springer on a judgment note $4362.75. About July 13, 1904, Springer induced appellant to exchange this note for three other notes of $2133.33 each, representing that they were secured by land in Kentucky. It was subsequently ascertained that Springer owned no land in Kentucky and that the notes were unsecured, and appellant notified Springer to that effect. About this time Springer was arranging with his creditors for a settlement. He owed at this time to the Northwestern Mutual Life Insurance Company some $465,000, which debt was secured by trust deed on his real estate, and had other obligations amounting to about $72,000. He was negotiating with his creditors to settle this latter indebtedness, by giving a series of new notes secured by a second deed of trust on his real estate. Springer of-

fered to appellant for the three Kentucky notes four notes secured by this deed of trust, each for $1108.14, the Equitable Trust Company being named as trustee in the trust deed. These latter four notes are the ones appellant alleges were improperly canceled by the Chicago Title and Trust Company. Appellant seems never to have had possession of these notes, and there is some controversy in the record as to whether he ever agreed to accept them. An order to turn them over to Springer is found in the record, signed in the appellant's name, which he claims he never signed and knew nothing about. Involuntary bankruptcy proceedings were begun in the United States district court against Springer, wherein he was adjudged solvent. Thereafter, on September 17, 1904, Springer conveyed certain property in Chicago to appellee Brougham, under an agreement that Brougham would satisfy or cause to be released the trust deed to the Equitable Trust Company securing $72,000, a part of which amount was represented by the four notes assigned to the appellant. At that date the appellant was represented by Furber & Wakelee, attorneys, who were trying to collect his claim against Springer. They took up the settlement of the appellant's claim with Brougham. In the negotiations by Brougham to settle with Springer's creditors it appears they were divided into two classes. He was negotiating to settle with the first class by paying them twenty-seven per cent of their claims in cash, sixteen per cent in an interest in property called in the record Park avenue property, and the balance in an interest in a part of the real estate that is sometimes called in the record LaGrange land and at other times Western Springs land, and which is situated between the villages of La-Grange and Western Springs. The second class of these creditors were to receive twenty-seven per cent of their claims in cash and the balance in an interest in another part of said LaGrange land. When attorney Wakelee first talked with Brougham about the settlement the latter stated

that he thought possibly he might be able to arrange to put appellant in the first class and settle on the basis outlined for that class. A day or two later Brougham told Wakelee that it would be impossible to put appellant in the first class of creditors but that he could settle with him on the same basis as outlined for the second class,—that is, twenty-seven per cent cash and the balance in an interest in the LaGrange land. Both Furber and Wakelee had a talk with appellant in regard to the settlement and they both testified that he agreed to accept the offer as made by Brougham. Appellant himself testified that he understood that he was to receive in settlement twenty-seven per cent of his debt in cash, sixteen per cent in Park avenue property and the balance in an interest in LaGrange property. From this record we think the settlement offered by Brougham and accepted by appellant was to put him among the second class of Springer's creditors, and that he should receive twenty-seven per cent in cash and the balance in an interest in the LaGrange property.

In pursuance of this settlement, on November 30, 1904, appellant signed, after its terms had been discussed in his presence, an escrow agreement to deposit the four notes, for $1108.14 each, in escrow with the Chicago Title and Trust Company, to be canceled upon there being conveyed to appellant "an interest amounting to 38/100 in and to certain property, [the LaGrange land—describing it,] but which interest the said Charles F. Dunbar is not to become entitled to and shall not vest in him" until the three Kentucky notes were delivered to the trust company by the bank then holding them in Kentucky. This escrow agreement was signed by appellant and by Douglas C. Gregg, the attorney for Springer. It also referred to a release dated November 23, 1904, signed by Charles F. Dunbar, to be delivered, along with said Kentucky notes, to Springer. The release referred to does not appear in the record. The escrow agreement was silent as to the amount that was to

be paid in cash. Wakelee and two other witnesses testified that the escrow agreement was read over to appellant before he signed it. At the time of this agreement the trust company held title to the LaGrange land in question under a deed which provided that said company, as trustee, should have full power to manage or dispose of the property in any manner deemed wise, and that no beneficiary under said conveyance should have any interest in the land itself but only a personal interest in the proceeds of the sale thereof. This deed was dated November 19, 1904, and acknowledged November 25 of the same year. December 9, 1904, the trust company executed a declaration of trust in accordance with the terms of said last mentioned deed. December 17, 1904, the so-called Kentucky notes were received by the trust company, with instructions to deliver them when an attached sight draft for $10 against appellant for services was paid. The trust company notified appellant of the receipt of the notes and sight draft. A copy of the declaration of trust, signed by the trust company, was sent to the office of Furber & Wakelee, attorneys for appellant, and he came to the office and looked it over. He claims that he then understood for the first time that he was not to receive sixteen per cent of his claim in the Park avenue property, and that he objected to the settlement. The attorneys, however, testified that he said he would think about the question. Shortly thereafter he consulted other attorneys and for the time being ended his relations with Furber & Wakelee. During their talk attorney Wakelee told him that the escrow agreement, as well as the declaration of trust provided, gave him too large an interest in the LaGrange land if he was to receive twenty-seven per cent of his claim in cash,—that is, those instruments provided for a thirty-eight per cent interest when they should only have provided for an interest of about thirty per cent in the LaGrange land.

There is a controversy in the record as to whether appellant refused absolutely to accept the declaration of trust. Be that as it may, he was evidently dissatisfied with the agreement and consulted various other attorneys, who called up Furber & Wakelee and asked them as to the situation. Apparently Furber & Wakelee did nothing further with reference to the claim until along in November, 1905, when appellant again came to their office and asked them to try to get a settlement of the Springer claim. Those attorneys both testified that after considerable talk, the details of which it is unnecessary to set out, they were instructed by appellant to take up the settlement of the claim again with Brougham and to agree that appellant would sign a paper by which he would reduce his interest in the LaGrange land from thirty-eight per cent down to thirty and thirty-three one-hundredths per cent, with the understanding that Brougham should pay the balance in cash. Furber wrote out a memorandum of these instructions at that time, which reads as follows:

"Go to Brougham, try and secure re-adjustment of proportions of land and cash so as to make the cash item twenty-seven per cent of claim. Then collect the money, and let Western Springs property agreement stand, whereby Mr. Dunbar will receive twenty-seven per cent cash and the remainder of interest in Western Springs property.

Nov. 4, 1905."

On the opposite side of this paper is found the following:

"This paper was read to Mr. Dunbar by H. J. Furber, Jr., and afterwards by H. W. Wakelee, who at the request of Mr. Dunbar eliminated the words 'twenty-five per cent' when it appeared.

Nov. 4, 1905.                          H. J. FURBER, JR.
                                       H. W. WAKELEE."

This document originally read "twenty-five per cent or twenty-seven per cent." Furber and Wakelee testified that they both read this over to appellant at his request, as he said he did not have his glasses with him, and that he agreed to it and told them to carry out the instructions as

stated in that memorandum. Appellant himself does not deny that he gave these instructions. It is manifest from the testimony of these witnesses that their instructions were to carry out the agreement as originally made,—that is, to correct the declaration of trust as to the amount of interest in the LaGrange land and collect the twenty-seven per cent cash for appellant. Acting under these instructions they arranged with Brougham to prepare a paper to correct the error in the declaration of trust. This paper was subsequently given to appellant by his attorneys, who told him that when he executed it he would receive the twenty-seven per cent of his claim in cash. He never signed the paper making this correction. He does not deny that he authorized them to make this arrangement, but afterwards seems to have been dissatisfied with the matter and refused to carry it out. He was sixty-seven years old at the time he gave his deposition. He had had a stroke of apoplexy and was partially paralyzed and in poor health. It is clear that during negotiations for this settlement he was told by his attorneys, Furber & Wakelee, fully of every step that was being taken and they explained to him at length what was being done. Either he did not grasp it all or became dissatisfied afterwards with what he had done and failed to carry out his part of the agreement.

Counsel for appellant argue at considerable length that the declaration of trust does not conform with the escrow agreement as to the character of the interest granted in the LaGrange land to appellant. We do not deem it necessary to decide that question. It is evident from the testimony that appellant never, in terms, refused to accept the interest granted him under the declaration of trust, and that the chief dispute arose over the fact that he was not paid his twenty-seven per cent in cash and sixteen per cent in Park avenue property in addition to the interest in the LaGrange land. Furthermore, there is no controversy that after understanding the entire situation, having consulted

with several other lawyers and waiting for nearly a year after the declaration of trust was executed, he authorized his former attorneys, Furber & Wakelee, to settle the claim on the basis of twenty-seven per cent cash and the balance (or seventy-three per cent) of his claim in thirty and thirty-three one-hundredths per cent of the proceeds of the LaGrange land when it should be finally disposed of by the trust company, as provided for in said declaration of trust. Whether he understood the settlement when he signed the escrow agreement is not material, as he afterwards expressly ratified that agreement and authorized a settlement on that basis.

The record shows that at the close of the evidence in the trial court Brougham tendered appellant in open court $1177.94, with the statement that it was twenty-seven per cent of appellant's claim and was offered upon condition that appellant would assign and convey to said Brougham the excess in the interest in the land secured to him by the declaration of trust. The record further shows that appellant refused the tender, and that thereupon Brougham tendered appellant in open court $372.75, said sum being the difference between appellant's claim against Springer and the value, figured at the agreed amount per acre, of the thirty-eight per cent in the LaGrange land secured by said declaration of trust. This latter tender was also refused, and thereupon the court dismissed the bill for want of equity. It is insisted that the trial court should have entered a decree in appellant's favor for $1177.94, as by tendering that amount it was admitted that appellant was entitled to it. The specific prayer for relief in appellant's bill would not justify that finding. Conceding, however, that the bill and prayer for general relief are sufficient to justify the entry of such order, (*Shields* v. *Bush,* 189 Ill. 534; *Casstevens* v. *Casstevens,* 227 id. 547;) the condition of the record forbids it. A tender, to be good, must be for a specific amount and offered without annexing any

terms or conditions. (*Pulsifer* v. *Shepard,* 36 Ill. 513; *Moynahan* v. *Moore,* 77 Am. Dec. [Mich.] 468, and note; 38 Cyc. p. 165, and cases cited; Harris on the Law of Tender, 122.) Appellant, under the agreement as made through his attorneys and which he afterwards ratified, was entitled to this $1177.94 in cash only on condition that he made the correction in the declaration of trust, otherwise, in equity, he was entitled to only $372.75 in cash. The case of *Uedelhofen* v. *Mason,* 201 Ill. 465, is not in point on the facts in this case as to the conditional offer of $1177.94. (See Hunt on Tender, sec. 400; *Mackey* v. *Kerwin,* 222 Ill. 371; 28 Am. & Eng. Ency. of Law,— 2d ed.—15, and cases cited.) If counsel for the appellant were here contending that the court should have entered a decree for $372.75, and had made that point in the trial court, there would be force in such contention. It is manifest that counsel in the trial court were not endeavoring to have the court enter a decree for $372.75 or for any specific amount. The question argued in the briefs as to whether $1177.94 was the proper amount to tender, provided the declaration of trust was corrected, was not raised in the court below and need not be decided here.

Counsel further contend that the condition attached to the first tender, involving the correction of the escrow agreement, required affirmative relief in favor of Brougham, and that this could only be granted by cross-bill praying therefor. Brougham was not asking for affirmative relief on the pleadings, and when making this conditional offer he did not request the court to enforce it. Whether or not it should be accepted was entirely voluntary on the part of appellant.

We find no reversible error in the record. The judgment of the Appellate Court will therefore be affirmed.

*Judgment affirmed.*