(No. 26745.—

BENJ. HARRIS & Co., Appellee, *vs.* WESTERN SMELTING & REFINING CO.—(WESTERN SMELTING & REFINING CO. *et al.,* Appellants.)

*Opinion filed November 17, 1942—Rehearing denied Jan. 14, 1943.*

LEDERER, LIVINGSTON, KAHN & ADSIT, (SIGMUND LIV-INGSTON, of counsel,) for appellants.

SIDNEY J. and ARTHUR WOLF, and J. ROBERT COHLER, (SIDNEY J. WOLF, and BERNARD K. SHAPIRO, of counsel,) for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

Plaintiff, Benj. Harris & Co., filed an attachment suit in the municipal court of Chicago against the Western Smelting & Refining Co. Mitchell-Jackson, Inc., was the owner of a warehouse in Chicago Heights, and, having possession of a carload of scrap brass involved, was named as garnishee in the proceedings. Bekins Van & Storage Co. intervened, claiming to own the brass in question. Benj. Harris & Co. claimed damages for breach of contract by the defendant in failing to deliver a carload of scrap brass sold to the plaintiff. Defendant was a nonresident. Mitchell-Jackson, Inc., was served as garnishee in the proceeding and answered it had possession of the brass, but had issued a warehouse receipt to the Bekins Van & Storage Co.

On the first trial the defendant defaulted. After default the plaintiff amended, raising the amount of damages from $1500 to $4000. The municipal court denied the intervening petition and found the defendant was the owner of the brass, and assessed damages against it in favor of the plaintiff for $3750. The intervenor appealed the case to the Appellate Court, where the judgment was affirmed. After affirmance in the Appellate Court, defendant and intervenor filed a petition in the municipal court raising the point the latter was without jurisdiction to enter the judgment because the affidavit of attachment was amended without notice to defendant. This petition was denied, and upon appeal the Appellate Court reversed its action, and the judgment originally entered was expunged. Thereupon defendant entered its appearance and answered, and the cause was retried in the municipal court, which found the scrap brass was owned by defendant; that it was liable for breach of contract, including interest, in the amount of $3960, and ordered the carload of brass in the warehouse sold, and out of the proceeds to pay the storage charges and the balance to the plaintiff. Both defendant

and intervenor appealed to the Appellate Court, which affirmed the judgment, with the exception that the allowance of interest was denied, thereby reducing the judgment to $3300.89; and a petition for appeal to this court has been allowed.

There are three principal issues in the case: (1) was the contract of sale breached by the defendant? (2) did the property attached belong to the defendant or to the intervenor? (3) was the proper measure of damages for breach of contract applied by the court?

The Western Smelting & Refining Co. had its place of business in Omaha, Nebraska. In 1934, through one Morton Alpirn, it purchased three cars of scrap brass from the Santa Fe railroad. Two of these cars were resold, but it appeared the defendant would be required to take delivery on the third car. Alpirn got in touch with Mr. Bekins, president of intervenor, a warehouse of said company being located in Omaha. Alpirn asked if Bekins wanted to invest in the brass, and this was agreed to be done. The evidence shows the understanding between the parties was that Bekins would buy the brass and pay all expenses of the delivery and storage, and when the brass was sold, if the deal was profitable, Alpirn was to get a commission commensurate with the amount of profit. Prior to that time the dealings for the purchase of brass from the Santa Fe railroad had been handled entirely by the defendant.

March 7, 1934, defendant gave its check to the railroad company in the amount of $4751.19. March 8, 1934, the intervenor paid to the First National Bank of Omaha the same amount of money, which was credited to the bank account of the defendant, and the brass paid for by the check of the defendant. The latter instructed the Santa Fe railroad to deliver the car to the Pennsylvania railroad, and the intervenor thereafter directed this railroad to deliver the car of scrap brass to the garnishee Mitchell-Jackson, Inc., and to have the latter issue a negotiable

warehouse receipt. The receipt was issued in the name of the intervenor and delivered to it, and thereafter the intervenor gave directions as to the control of the property, and paid all warehouse and other charges.

In 1936 defendant wrote to Mitchell-Jackson, Inc., requesting that they show the brass to a prospective purchaser, referring to it as a "carload of brass we have stored in your warehouse." The evidence shows the defendant is indebted to the intervenor in an amount in excess of $30,000, which was secured by property in the latter's warehouse. The representatives of both the defendant and intervenor say these transactions were entirely different than the one in question, and that as to this particular transaction the Bekins Company owned the brass, and that the defendant was not indebted to it for the purchase price or any charges thereon. However it appears from the intervenor's books the various expenditures on this transaction were all carried in one general account of the Western Smelting & Refining Co.

In November, 1936, defendant wrote plaintiff concerning the sale of the brass. Following this letter, plaintiff on November 30 agreed to purchase the brass from the defendant at 6¼ cents per pound, f.o.b. Chicago Heights, terms 90%. The agreement was made with the defendant and the intervenor took no part in the negotiations. However, on December 7, 1936, intervenor wrote plaintiff, advising them they were releasing to them the warehouse receipt, and were drawing a draft on the plaintiff in the sum of $5625 through the Northern Trust Company. The warehouse receipt and draft were received by the trust company on December 8, and notice sent to plaintiff requesting payment on the 9th. Under date of December 8, plaintiff had written intervenor, in answer to the letter of the 7th, they would take care of the draft with the understanding there were no encumbrances, and that storage charges would be paid. December 12 plaintiff wrote

intervenor they wished advice that the storage charges were paid, and that they had been advised the warehouse charges were not paid. December 14 intervenor telegraphed plaintiff their draft had been reduced by the balance of the warehouse charges and requested payment be made that day. But on the same day the defendant telegraphed for $500. December 14, after receiving the demand for $500 from defendant, plaintiff wrote stating they would like to have an invoice either from the Bekins company or Western Smelting, because the Bekins company had drawn on them, and plaintiff believed it would be necessary to know who would receive the money covering the transaction.

December 14, at 9:20 P. M., intervenor wired Mitchell-Jackson, Inc., the deal was canceled, and they were not to deliver the metal, and at 8:30 A. M. December 15 intervenor telephoned the bank not to accept the money or deliver the warehouse receipt. At 2:15 P. M. December 15, after the bank had closed, plaintiff offered to pay the amount of the draft to the bank, but was advised it had been returned. December 16 intervenor wrote Mitchell-Jackson, Inc., the deal was off, and December 23 defendant, Western Smelting & Refining Co., wrote the Grand Haven Brass Foundry stating they had for sale 100,000 pounds of yellow brass and railroad brass stored in the Mitchell-Jackson, Inc., warehouse in Chicago Heights. In January, 1937, the intervenor wrote the attorney for plaintiff stating they had not sold the brass, and that they would be pleased to receive an offer from plaintiff, and saying the current market quotations were $12\frac{3}{4}$ cents per pound.

The trial court held that the defendant had breached its contract with plaintiff in failing to deliver the brass, and that defendant was the owner of the brass in the Mitchell-Jackson, Inc., warehouse.

On the issue of damages, plaintiff proved the market price raised on the afternoon of December 14, 1936, and that for some time thereafter it was practically impossible

to buy scrap brass. Plaintiff also proved defendant knew the brass was to be used for smelting purposes in making brass ingots. It also offered evidence that when scrap brass is not available on the market it is necessary for them to purchase the nearest substitute, which is scrap copper, scrap tin, lead and zinc, which metals can then be melted and made into ingots of the proper percentage for brass. Plaintiff proved the market price of such substitute materials at the time of the breach of contract, which would make the brass thus produced cost a little more than 9 cents per pound. The evidence on the first trial shows that the price of scrap brass had increased one-fourth cent by December 15, 1936, and defendant therefore claims the damages should be limited to $250.

On the second trial Harris testified that by his testimony in the former case he meant he had endeavored to buy scrap brass for one-fourth of a cent per pound more than the contract price, but was unable to do so. Appellants contend there was a market for scrap brass during December, 1936, because the books of plaintiff show several purchases during the following months. However, it appears these purchases, which were consummated at this time, had been contracted in previous months. There was also proof of a trade journal, quoting metal prices for the period involved, below those upon which the court allowed damages. Representatives of these journals, however, testified that the quoted prices were those at which dealers were willing to buy, and would not necessarily indicate any sales had been made at such figures.

The substance of plaintiff's evidence on the issue of damages was that the cost of the metal substitutes furnished was the least amount for which plaintiff could acquire brass. It is fairly established there was no scrap-market at the time of the breach of contract by the defendant. There is evidence in the record from dealers in scrap, of many years experience in handling a great volume

of business, that it was almost impossible to buy scrap brass at any price, and that certainly a premium of four or five cents per pound would necessarily be paid to acquire it. This, to a certain extent, is borne out by intervenor's letter, in which they quote a price of $12\frac{3}{4}$ cents per pound, which affords some measure of the value, as it is unlikely such a quotation would be made without some substantial reason.

Upon the issues of whether the contract was breached by defendant, and whether the brass was owned by intervenor, there was ample evidence to sustain the finding of the trial court. The actions of defendant and intervenor with respect to their prior dealings, the giving of directions with respect to payment, and the other circumstances in evidence leave it open to the court to find who was the actual owner, and whether the contract had been breached. On these questions the judgments of the trial and Appellate courts are conclusive, and will not be disturbed by us.

Appellants, however, claim improper evidence was received upon the question of the amount of plaintiff's damages when the court permitted proof to be made of the value of the component metals constituting brass, even though it were shown scrap copper and scrap tin were to be acquired for such purpose. The statute provides the measure of damages of the buyer from the seller for breach of contract, when the title to goods has not passed, is "the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract." (Ill. Rev. Stat. 1941, chap. $121\frac{1}{2}$, par. 67(2).) It also provides when there is an available market, in the absence of special circumstances, the measure of damages is the difference between the contract price and the market or current price at the time the goods should be delivered. (Chap. $121\frac{1}{2}$, par. 67(3).) There is no statutory provision for ascertaining damages when there is no market or current price available.

Under such circumstances the rule seems to be well settled that where the thing sold is of a kind that has no market value, then the actual value must be determined by the best evidence available, and this being ascertained, the measure of damages is the difference between the contract price and the value of the thing sold, at the time and place of delivery. In such cases the value is sometimes ascertained by proof of what it would cost a purchaser, acting in good faith and with diligence, to procure the kind or article of goods contracted for. *Vulcan Iron Works Co.* v. *Roquemore*, 175 Fed. 11; *Grand Tower Co.* v. *Phillips*, 23 Wall. 471, 23 L. ed. 71.

In *Jordan* v. *Patterson*, 67 Conn. 473, 35 Atl. 521, and *Den Bleyker* v. *Gaston*, 97 Mich. 354, 56 N. W. 763, it is held that the fact there is no market price for an article at the time of the breach of the contract of sale may be proved by the testimony of any person who has knowledge of the subject, and in the absence of a market or current value the cost of substitutes may be taken into consideration in ascertaining the actual value. The rule is well stated in Williston on Sales, sec. 599, "it will not infrequently happen that goods have no market value or none which can be determined with any exactness. Wherever goods are of a special kind or are of a peculiarly good or bad quality this is likely to occur. In such case the court must determine the value of the goods as best it can by considering the expense to the buyer of securing similar goods, or goods which would equally well serve the purpose."

We might doubt that the evidence objected to, standing alone, would afford a satisfactory measure of plaintiff's damages, because usually the substitute is in the same form as that of the thing purchased or sold, and not the several constituent parts thereof, but when the evidence objected to is considered with all of the other facts in the case the tendency was to reduce the amount of damages rather than

to enhance them. The evidence given by dealers in scrap brass, and the price quoted by intervenor, furnished a higher measure of damages than allowed by the court. We are satisfied the record shows there was no market or current price for scrap brass at the time of the breach of contract by the defendant, and for some time thereafter, and that the evidence as a whole sustained the finding of the trial court. Had the evidence objected to not been offered, a larger recovery could have been sustained. The error, if any, is not harmful to appellant.

It is also claimed by appellants that a tender, made upon the first trial, by the plaintiff to intervenor, for the amount of the contract price, constitutes a binding admission either that intervenor was the owner of the brass, or that the plaintiff is indebted to it in such sum. It appears that on the first trial Bekins was claiming ownership of the brass in question and held the warehouse receipt. The tender was refused, and upon the trial the court found the intervenor was not the owner, and the Appellate Court upon appeal sustained it. It is obvious the plaintiff was endeavoring to get title to the brass, and if Bekins had the ability to transfer the title, or to transfer a lien, the payment of the money was necessary. The tender of the money was an admission that such a sum should be paid to acquire title to the property. It was not an admission that plaintiff should receive no damages for the breach of contract to deliver. There was nothing in tendering the money that would do more than admit the plaintiff owed this sum of money after the delivery of the carload of brass. Had the tender been accepted it would have received the warehouse receipt and had title to the property and the lawsuit would have been ended. The claim of the Bekins Company that it is an admission of title in it, which would defeat the attachment, is without merit. Under the facts here disclosed Bekins and Western Smelting were apparently act-

ing together, and the offer of money by the plaintiff, necessary to acquire the warehouse receipt, was only a continuing offer to pay for the goods purchased, and by so doing it only admitted Bekins held evidence of title, and not that he actually owned it. In *Dunbar* v. *Springer,* 256 Ill. 53, a tender was made in court conditioned upon the conveyance of certain interests in real estate described in a declaration of trust, which tender was refused. In that case it was held that the party was entitled to the amount of the tender only upon condition he made the conveyance for which it was offered.

All of the circumstances in this case show the tender was for the same purpose, and the Appellate Court having found the Bekins company was not the owner of the scrap brass, plaintiff is neither bound to pay the amount formerly tendered, nor does it constitute an admission the Bekins company was the owner of the property at the time the attachment was sued out.

There are other points argued by appellants, which we have considered but deem unnecessary to discuss, since the foregoing are determinative of the case. As pointed out above, the questions whether defendant breached the contract and whether intervenor was the owner of the goods at the time the attachment was levied, were questions of fact, which are settled by the judgments of the trial and Appellate courts.

This case has been before the courts many years, with uniformly the same result, and after careful consideration of the evidence and the legal propositions involved, we are of the opinion the judgment of the Appellate Court for the First District should be and is affirmed.

*Judgment affirmed.*