GRIDIRON STEEL COMPANY, Plaintiff-Appellant,

v.

JONES & LAUGHLIN STEEL CORPORATION, Defendant-Appellee.

GRIDIRON STEEL COMPANY, Plaintiff-Appellee,

v.

JONES & LAUGHLIN STEEL CORPORATION, Defendant-Appellant.

Nos. 16125, 16126.

United States Court of Appeals
Sixth Circuit.

June 11, 1966.

Harold K. Bell, Cleveland, Ohio, Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, Hal D. Cooper, Cleveland, Ohio, on brief, for Gridiron Steel Co.

Walter J. Blenko, Pittsburgh, Pa., Walter J. Blenko, Jr., Pittsburgh, Pa., on brief; Blenko, Hoopes, Leonard & Buell, Pittsburgh, Pa., Richard F. Stevens, H. Stephen Madsen, Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel, for Jones & Laughlin Steel Corporation.

Before WEICK, Chief Judge, CELEBREZZE, Circuit Judge, and CECIL, Senior Circuit Judge.

WEICK, Chief Judge.

Gridiron Steel Company,[1] an Ohio corporation, sued Jones & Laughlin Steel Corporation, a Pennsylvania corporation, in the District Court to recover unpaid

1. Gridiron Steel Company will be referred to as Gridiron, Jones & Laughlin Steel Corporation as J&L, and Geuder, Paeschke & Frey Co., a Wisconsin corporation, as Geuder.

royalties due under the provisions of a patent license agreement covering metal ironing tables, and also for damages for breach of the provisions of the agreement which granted an option to the licensor, upon termination of the agreement, to purchase special tools and dies in current use by the licensee in the manufacture of the ironing tables.

The case was submitted to the Court without the intervention of a jury. The District Judge in a carefully prepared Memorandum Findings of Fact and Conclusions of Law, determined that J&L breached the agreement, but rendered judgment only for nominal damages in the amount of $500. With respect to the claim for royalties, he found that the sum of $12,289.95 was due Gridiron under the provisions of the license agreement and rendered judgment against J&L in that amount.

Gridiron appealed in case number 16,-125 from the judgment in its favor in the amount of five hundred dollars, on the grounds that the award of damages was inadequate and that the District Judge applied the wrong measure of damages.

J&L appealed in case number 16,126 from the judgment against it for royalties in the amount of $12,289.95. Its appeal was dismissed as untimely filed but the judgment of dismissal was reversed by the Supreme Court and the appeal has since been reinstated. 382 U.S. 32, 86 S. Ct. 152, 15 L.Ed.2d 26 (1965).

### BREACH OF AGREEMENT

The license agreement upon which the action was brought was entered into on February 8, 1940, between Gridiron, as licensor, and Geuder, Paeschke & Frey Co., as licensee. Attached as an exhibit thereto was a list of pending applications for patent owned by Gridiron, on which four patents were subsequently issued which relate to this case and will be discussed later in this opinion. Geuder manufactured and sold ironing tables under the license agreement and paid certain royalties therefor.

On September 1, 1957 Geuder sold to J&L its metal ironing table business, including special tools, dies, ironing board leg patents, and patent applications therefor, and assigned to it the license agreement. J&L assumed all of Geuder's obligations under said license agreement.

J&L manufactured and sold ironing tables, using the tools and dies which it acquired from Geuder. On March 10, 1958, J&L gave to Gridiron written notice of termination of the license agreement to become effective on February 8, 1959. At that time patents 2,215,918 and 2,233,735 had expired. Patent 2,263,765 ran until November 11, 1958 and patent 2,319,397 ran until May 18, 1960.

The licensing agreement provided that the licensee had the right to terminate the agreement on any anniversary date by giving ninety days' written notice. The agreement granted to Gridiron the option upon termination to purchase all dies and special tools used to manufacture ironing tables, in the following language:

"Further agreed that if and when this contract shall be terminated, from whatever cause, and upon the completion of the manufacture and delivery by Geuder of any boards previously sold but still undelivered, Gridiron shall have an option for a period of ninety (90) days to purchase from Geuder for the sum of Seven Thousand Five Hundred Dollars ($7,500) cash all dies, patterns, and special tools at that time in current use by Geuder in connection with the manufacture of ironing tables under this contract."

The agreement further provided that upon termination Geuder was to transfer to Gridiron, at its actual cost, whatever patent rights or license it might have for ironing board legs or supports.

Without notice to Gridiron, J&L sold to Arvin Industries on June 2, 1958, its ironing table business, including the dies, tools and leg and support patents which were the subject of the option provisions above set forth.

Upon the termination of the license agreement, namely, on February 24, 1959, Gridiron gave written notice to J&L of its exercise of the option to purchase the

tools and dies for the sum of Seven Thousand Five Hundred Dollars, but J&L, having previously sold them to Arvin, refused to comply with the option agreement.

In the District Court, as well as here, J&L contended that it had no dies and tools "in current use" on the date of the termination of the license agreement since it had previously sold them to Arvin, and that it therefore was under no obligation to perform the option provisions of that agreement. In other words, it was the view of J&L that all it needed to do to avoid liability under the license agreement was to sell the optioned property to a third party.

A statement of this proposition is its refutation. Even where liability under a contract depends upon a condition precedent, one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it. Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12, 16 (6th Cir. 1965); Gulf Oil Co. v. American-Louisiana Pipe Line Co., 282 F.2d 401 (6th Cir. 1960).

The District Court was correct in holding that J&L breached the agreement. The only question remaining is whether the award of nominal damages was proper.

### DAMAGES

Gridiron contended that the District Court applied the wrong measure of damages. It claimed that ordinarily it would have been entitled to recover the difference between the market and the contract price of the tools and dies, but since it was agreed that there was no available market, the measure of recovery was the cost of manufacture of new tools and dies, less the option price. It relied on E. W. Bliss Co. v. Buffalo Tin Can Co., 131 F. 51 (2nd Cir. 1904) and Rochester Lantern Co. v. Stiles & Parker Press Co., 136 N.Y. 209, 31 N.E. 1018 (1892), and other cases to the same effect.

These two cases involved breach of contract by sellers of articles to be manufactured, i. e., new products. In the present case Geuder made the dies in its own shops, and the tools and dies had been used for some time by Geuder and J&L, and later by Arvin. We may infer from the evidence that they were in good condition when sold to J&L and to Arvin because they were being used in the manufacture of ironing tables, but they were not new. In our opinion, Gridiron was not entitled to recover the cost of new dies and tools, but only the value of the used ones, less the option price.

J&L did not carry the tools and dies on its books at any stated figure. Its sale to Arvin was for cash and shares of stock. Other items were included in the sale and the value of each item was not specified.

The dies and tools were custom made and unique. It was difficult for Gridiron to prove the value of the tools and dies at the time the contract was breached. They were no longer in the possession of J&L and had been removed to the plant of Arvin. Gridiron did procure estimates of the cost of replacement of new tools and dies necessary for the manufacture of the ironing table, which amounted to $83,230 and $115,480.

Answers of J&L to interrogatories were offered in evidence, which disclosed that J&L in connection with its purchase had received from Geuder a report of an independent appraisal of certain tools and dies, made on January 18, 1957, which was attached as an exhibit to its answers. The District Court found that in the appraisal the replacement costs of the tools and dies listed therein were valued at $46,500, and the sound value thereof at $34,875.

Although not binding on Gridiron, the answers by J&L to the interrogatories constituted admissions against its interest. Heilig v. Studebaker Corp., 347 F.2d 686 (10th Cir. 1965). Answers by a party to interrogatories may be used for any purpose. Rule 26(d) (2), Fed. R.Civ.P.; 4 Moore's Fed.Prac. 2nd Ed. § 33.29, p. 2342.

J&L ought not to be permitted to complain because the damages cannot be

measured with precision since it was responsible therefor. Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Smith v. Onyx Oil & Chem. Co., 218 F.2d 104, 50 A.L.R.2d 216 (3rd Cir. 1955); Bishop v. East Ohio Gas Co., 143 Ohio St. 541, 545–546, 56 N.E.2d 164 (1944).

In such circumstances, the actual value of the dies and tools must be determined by the District Court from the best evidence available. Expert testimony may be used for this purpose. The Court may consider the evidence as to cost and other factors which may affect value or tend to show worth. Gridiron is entitled to be fully compensated for its loss. Bishop v. East Ohio Gas Co., supra.

When the value has been ascertained, the measure of damages is the difference between the option price and the value of the dies and tools so determined. Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697, 53 S.Ct. 736, 77 L.Ed. 1449 (1933); Benjamin Harris & Co. v. Western Smelting & Refining Co., 313 Ill.App. 455, 40 N.E.2d 747, aff'd, 381 Ill. 443, 45 N.E.2d 639; Bishop v. East Ohio Gas Co., supra; 78 C.J.S. Sales § 549, pp. 240, 241.

We are not unmindful of the fact that Gridiron could have taken depositions of officers of Arvin and obtained information which might have thrown light on the condition of the tools and dies and their value, but did not do so. It could have offered expert testimony on the value of the used tools and dies. Gridiron directed its efforts to the production of evidence primarily on replacement cost. This evidence was relevant only as bearing on value, which must be determined by the Court from all the evidence.

We can hardly believe that tools and dies in good condition, which cost $115,480 to replace and were appraised at $34,875, would depreciate in value to only $500 in the months which followed the date of appraisal until the date of the sale made by J&L to Arvin. In our opinion, it was error to allow damages only in the nominal sum of $500.

The fact that Gridiron was not in the manufacturing business, but desired to have the ironing tables made for it by others, does not defeat its claim for damages. Nor is it defeated by the fact that on the termination date of the license one patent had expired and the other had only fifteen months to run.

Gridiron further claimed damages for failure of J&L to assign to it eleven patents on ironing board legs or supports, which were included in the sale made by J&L to Arvin. These patents had been initiated by Geuder, and at the time of the transfer to J&L some of them were still in application form.

The license agreement required Gridiron to pay Geuder's actual costs for procuring said patents. No evidence was offered as to the amount of these costs.

From what has been previously said it is clear that J&L breached the license agreement by transferring the leg patents to Arvin, thereby preventing itself from performing said agreement.

Gridiron undertook to prove damage by the testimony of its president, Robert J. Fay, who had technical training and was a patent attorney. He had experience in the ironing board business and in buying and selling patents, although not on ironing tables. From his testimony it appeared that only two of the leg patents had been used by Geuder and J&L in Model C–690 (Exhibit 5). This model was held by other Courts to infringe Claim I of Olander ironing table leg Patent No. 2,633,102. The J. R. Clark Co. v. Geuder, Paeschke & Frey Co., D.C., 159 F.Supp. 948, aff'd, 259 F.2d 737 (7th Cir. 1958), cert. denied, 359 U.S. 914, 79 S.Ct. 587, 3 L.Ed.2d 576; The J. R. Clark Co. v. Jones & Laughlin Steel Corp., D.C., 186 F.Supp. 22, aff'd, 288 F.2d 279 (7th Cir. 1961), cert. denied, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32. Model C–690 was therefore subject to the Olander leg patent.

Mr. Fay valued each of the eleven leg patents transferred by J&L to Arvin at $2,000, and arrived at a total damage of $22,000. He had made no investigation to determine the validity of any of these

patents. There was no evidence that any use had ever been made of the leg patents (other than on the model which infringed Olander). Nor was there any proof of the novelty or usefulness of the leg patents. See Sinclair Refining Co. v. Jenkins Petroleum Process Co., supra. It is a matter of common knowledge that not all inventions meet with success and many patents have been issued on worthless inventions. We do not understand how the expert could arrive at the same value for each of the eleven patents.

■ The District Judge concluded that the expert's evaluation of the ironing table leg patents "is inadequate and worthless." In our judgment this was the only conclusion he could properly reach from the evidence. He was not bound to accept the expert testimony even though it was not contradicted, especially since a proper foundation had not been laid for the reception of such evidence. Sinclair Refining Co. v. Jenkins Petroleum Process Co., supra; Mound Co. v. Texas Co., 298 F.2d 905, 910 (5th Cir. 1962).

## ROYALTIES

J&L paid royalties to Gridiron on its sales of model C–690 ironing tables until March 4, 1958, when patent '735 expired. It then ceased all royalty payments, claiming that this model embodied only the features of the invention disclosed in expired patent '735 and that it was not obligated to pay royalties as the invention was in the public domain. Scott Paper Co. v. Marcalus, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945). It denied that model C–690 included any of the features of patent '397 which was in full force and effect and did not expire until May 18, 1960.

J&L continued to make and sell the same model ironing table, but eliminated the patent markings thereon of both '735 and '397 patents which it had marked on the ironing tables since September 1, 1957 when it acquired the ironing table business from Geuder. The evidence disclosed that Geuder had marked these two patent numbers on C–690 models con-

tinuously from 1946 until it sold the license to J&L.

The license agreement provided with respect to patents which "cover the construction then employed" that the licensee mark each of the tables embodying the invention with the word "Patent" and the number of the patent.

In the license agreement the licensee acknowledged the validity of all letters patent.

The findings of fact of the District Court are to be considered: First, the finding that Model C–690 did embody features of patent '397; and Second, the finding that since Geuder and its successor, J&L, had marked this model with patent number '397 for twelve years, J&L was estopped from denying that the model which it had thus marked embraced any of the features of said patent.

The top of Model C–690 ironing table consisted of two sheets of thin metal. The bottom sheet had longitudinal ribs. The sheets were held together by holes punched through the metal from the top at places where the ribs of the bottom sheet came into contact with the top sheet and rivets were formed on the bottom sheet. The edges of the two sheets were combined in a peripheral flange which extended around the entire periphery of the top. The flanges on '735 and '397 patents were designed and constructed differently.

■ The District Court found that the tables manufactured by J&L did not include all the features disclosed in '735 patent but "did include the provision of a flange on the top sheet extending below the plane of the lower sheet, and there is no question but that J&L took the flange construction feature from the '397 patent." We think this finding of fact is supported by substantial evidence. In patent '735 claim 3 provided only for a flange formed by the edge of the top sheet being formed into a continuous down-turned flange. In the tables manufactured by J&L the flange extended below the adjacent edge of the bottom sheet as disclosed and claimed in '397 patent.

The much stronger ground, however, is estoppel.

 Geuder and its successor, J&L, for a period of twelve years marked ironing tables manufactured by them with the '397 patent. This was required by the license agreement with respect to construction embodying the features of the patent. Having marked the tables with the patent number, the licensee is estopped from claiming that the tables did not embrace features of the marked patent. Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 32 F.2d 882 (6th Cir. 1929), cert. denied, 281 U.S. 735, 50 S. Ct. 249, 74 L.Ed. 1150 (1929); Ellis, Patent License § 121 (3rd Ed. 1958).

 J&L may not relieve itself of liability for the payment of royalties by eliminating the patent marking in manufacturing and selling the table of construction identical with the one previously marked. Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., 44 F.Supp. 401 (S.D.N.Y., 1941); Piaget Novelty Co. v. Headley, 108 F. 870 (2nd Cir. 1901).

The fact that J&L did not continue the marking as long as Geuder did, is immaterial. It stepped into the shoes of Geuder and assumed, and was bound by, all of Geuder's obligations and liabilities under the agreement. It marked the tables it manufactured with patent '397 from September 1, 1957 until March 4, 1958. If it desired to question the applicability of patent '397 to the ironing table which it intended to manufacture, it should have refrained from marking the table with that patent number. Thus it would have avoided any question of estoppel, but may have subjected itself to liability for failure to mark the table if it was later determined that the table did embrace features of patent '397.

The remaining question relates to royalties on model C–150 ironing table. This was a competitive table selling at a cheaper price, for which type a royalty of five cents per table was provided in the license agreement. Geuder paid no royalties on this model although for a time it did make and sell this model. It paid royalties on other competitive type models. There is no evidence that Gridiron had knowledge of the manufacture and sale by Geuder of model C–150 tables, and no proof was offered that Gridiron abandoned its claim for royalties.

J&L contends that model C–150 did not include the same elements as those disclosed in C–690, but the District Court found that it did. It has a similar top sheet but the under sheet did not contain longitudinal ribs, but a plurality of widely separated laterals fastened to the top sheet at intervals. The laterals include a flange identical to the C–690 model, with the flange co-operating with the inwardly-turned edge of the top sheet. The flange and top sheet serve to cover the adjacent edge of the laterals. The same assembly tools could be used to make either C–150 or C–690 model.

J&L contends that since model C–150 has no continuous bottom sheet it does not fall within the scope of '397 patent.

 The District Judge was of the opinion that C–150 tables involved features of '397 patent and were readable on claims 4 and 5 of that patent. He also found that models C–150 and C–690 were equivalents, even though they contained variations in the under structure or bottom sheet. He was of the view that it had not been demonstrated that any benefit was derived from the change of the bottom sheet, except economy in the production, and that the variations in the bottom sheet were inconsequential alterations which were insufficient to avoid the application of the doctrine of equivalents. The two tables, in our judgment, meet the test of the doctrine of equivalents as determined by the Supreme Court. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608–609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). A finding of equivalence is one of fact. In our opinion the finding of fact of the District Judge was not clearly erroneous. Rule 52 Fed.R.Civ.P.

## INTEREST

■ Gridiron is entitled to interest on its royalty claim from the time when the royalties should have been paid. Swan Carburetor Co. v. Nash Motors Co., 133 F.2d 562 (4th Cir. 1943). It does not appear that this matter was called to the attention of the District Judge.

In appeal number 16,125 the judgment of $500 is vacated and the case is remanded for a new trial only on the issue of damages for breach of the option contained in the license agreement to purchase the tools and dies. The action of the District Court in denying damages for breach of the agreement to assign the leg patents, is affirmed.

In appeal number 16,126 the judgment of the District Court is affirmed and the cause remanded to allow interest as stated in the opinion.