Benj. Harris and Company, Appellee, v. Western Smelting and Refining Company, Appellee. Bekins Van and Storage Company, Appellee. Mitchell-Jackson Inc., Appellant. Albert J. Horan, Bailiff, Appellee.

Gen. No. 42,828.

610

Heard in the third division of this court for the first district at the October term, 1943. Opinion filed April 26, 1944.

Joseph H. Horwich, of Chicago, for appellant.

Sidney J. & Arthur Wolf and J. Robert Cohler, all of Chicago, for certain appellee; Sidney J. Wolf and J. Robert Cohler, both of Chicago, of counsel.

Mr. Justice Burke delivered the opinion of the court.

On January 8, 1937, Benj. Harris & Company, a corporation of Chicago Heights, Illinois, filed an attachment suit in the municipal court of Chicago against Western Smelting & Refining Company, a corporation of Omaha, Nebraska. Mitchell-Jackson, Inc., a corporation, which operates a storage warehouse at 1107 South Washtenaw avenue, Chicago, was named as garnishee. On January 9, 1937 an attachment writ was served on Mitchell-Jackson, Inc., as garnishee. On February 10, 1937 the garnishee filed its answer, stating that it had in its possession "one carload of copper," which it received on May 5, 1934; that it had no knowledge of any interest of the defendant in the merchandise; that the shipment was placed in its warehouse for storage by the Bekins Van & Storage Company, a corporation of Omaha, Nebraska, and that it was advised that the latter was in possession of the warehouse receipt. Melvin Bekins filed an intervening petition on behalf of Bekins Van & Storage Company. A trial resulted in a judgment for the plaintiff and against defendant and the garnishee was ordered to deliver the carload of brass forthwith to the bailiff on special execution. Upon an appeal to this court the judgment was affirmed. The opinion was reported in abstract form. (294 Ill. App. 610.) A petition for leave to appeal from the judgment of this court was denied. On July 19, 1938 defendant and intervenor filed a petition in the municipal court of Chicago under section 21 of the act governing that court, seeking to vacate the judgment on the ground that the plaintiff

had amended its statement of claim, increasing its damages without notice to defendant, which had been served by publication. The trial court entered an order denying the petition. Upon appeal we reversed the order and remanded the cause with directions to allow the prayer of the petition. (302 Ill. App. 535.) The case was redocketed in the municipal court of Chicago and plaintiff republished against the defendant in the attachment proceeding. After the second publication the defendant filed its answer and the case was again tried. The attachment was sustained and judgment entered against defendant for $3,960.89 and costs, and it was ordered that a general and special execution issue against the carload of brass in the possession of the garnishee. The judgment order specifically directed the garnishee to deliver the carload of brass forthwith to the bailiff on special execution. On appeal we modified the judgment by deducting the sum of $660 allowed as interest, making the judgment $3,300.89, and affirmed the judgment as modified. (313 Ill. App. 455.) The Supreme Court granted leave to appeal and affirmed the judgment of this court. (381 Ill. 443.) After the case was redocketed in the trial court a judgment was entered in accordance with the mandate of this court, reducing the judgment to $3,300.89 and costs, with interest thereon from January 29, 1941. Special execution was placed with the bailiff. A bailiff's sale was held on February 16, 1943. Plaintiff was the successful bidder in the sum of $5,500 for "one carload of mixed brass." Thereby, plaintiff purchased from the bailiff "one carload of mixed brass." It paid the sum of $2,125.46 to the bailiff to cover garnishee's unpaid charges and $121 to cover bailiff's fees and expenses. The balance of the bid in the sum of $3,253.54 was credited by the bailiff in partial satisfaction of plaintiff's judgment against defendant, leaving a deficiency of $47.35, plus interest at 5 per cent per annum of $3,300.89 from January 29, 1941 to the date of the sale. The sale was conducted at

the warehouse. There was no request that the brass be weighed at the warehouse at any time prior to the bailiff's sale. A day or two after the sale plaintiff caused the brass to be weighed at the warehouse and it weighed 47,055 pounds. The brass was shipped from the warehouse in Chicago to plaintiff's plant at Chicago Heights on February 20, 1943. When weighed on arrival at the plaintiff's plant, the brass weighed 46,732 pounds.

On March 4, 1943 plaintiff filed a petition in the municipal court of Chicago, setting forth the facts substantially as recited above, and also alleging that after the sale plaintiff took possession of the brass delivered to it by the bailiff and caused the same to be weighed and found for the first time that 53,293 pounds of brass were missing; that it immediately notified the bailiff and the garnishee of the shortage; that since it has been negotiating with the garnishee in an attempt to effect an adjustment; that plaintiff's bid was based "on the fact that this court had adjudicated that said carload of brass consisted of 100,025 pounds of brass," whereas in truth and in fact plaintiff received only 46,732 pounds of brass; that plaintiff was holding the brass so delivered and offered to return the brass to the bailiff. Plaintiff in its petition prayed (a) that the bailiff's sale be vacated, set aside and held for naught, and that the partial satisfaction on account of the judgment by the credit of a portion of the proceeds of the sale be vacated and set aside and held for naught, and that the bailiff and garnishee be directed to return to plaintiff all sums of money received by either of them in connection with or as a result of the sale: (b) that judgment be entered in favor of plaintiff and against the garnishee for the value of the brass representing the shortage; (c) that a new sale be held by the bailiff of the brass which petitioner is holding for the bailiff; (d) that the garnishee show cause why it should not be held for contempt of court for failure or refusal to deliver to the bailiff all of the brass which

it had in its possession at the time it was served with the attachment writ; (e) that the court authorize and direct such proceedings or steps as may be proper or necessary to recover for the use and benefit of plaintiff, the value of the brass represented by the shortage; and (f) that plaintiff have such other and further relief in the premises as to the court may seem meet. Answers were filed by the garnishee, the defendant and the bailiff. After a trial before the court on May 5, 1943 an order was entered finding that the facts were substantially as contended by plaintiff; that the fair cash market value of the brass at the time of the sale was $6.10 per 100 pounds; and that the fair cash market value of the 53,293 pounds of brass was $3,250.87. The court found in favor of plaintiff and against garnishee and entered judgment for $3,250.87, and further ordered that the petition be dismissed as to the defendant and bailiff. Garnishee appeals.

The trial court heard the testimony of numerous witnesses and read many exhibits and found that on April 5, 1934 the Santa Fe railroad delivered one carload containing 100,025 pounds of brass to defendant at garnishee's warehouse; that the garnishee issued its warehouse receipt No. 587 covering the carload of brass; that on January 9, 1937, while this carload of brass was in possession of the garnishee, the latter was served with an attachment writ and garnishee summons; that special execution having been issued in favor of defendant for use of plaintiff and against the garnishee, the bailiff held a sale on February 16, 1943; that plaintiff appeared at the sale and bid $5,500 for all right, title and interest of the defendant in and to the carload of brass covered by warehouse receipt No. 587, which was the highest and best bid offered and was accepted by the bailiff; that plaintiff paid $2,125.46 to the bailiff in payment of the warehouse charges and expenses of the garnishee and the further sum of $121 to the bailiff for his commission in the

sale; that the balance was paid by the plaintiff by credit thereof on account of the judgment in favor of plaintiff and against defendant; that after the sale garnishee delivered to plaintiff 46,732 pounds ''of said brass'' purchased by plaintiff at the sale, but garnishee refused or neglected to deliver to plaintiff as lawfully required the balance of the carload of brass consisting of 53,293 pounds; and garnishee contends and asserts that it is unable to produce or deliver the 53,293 pounds of brass, and asserts that the 53,293 pounds of brass are not in its possession, but it is unable to explain the loss or disappearance of the brass.

The testimony of Frank Swiatkowski and Peter Young, on behalf of plaintiff (petitioner) was that Santa Fe freight car No. 128300 was loaded with brass and that the net weight was 100,025 pounds. Swiatkowski was weighmaster for the railroad at the time and identified the railroad weigh ticket, which bears the signature of Swiatkowski and shows the net weight as 100,025 pounds. He testified that the freight car was sealed by him after being weighed and was then shipped to garnishee. The inbound tally sheet prepared by garnishee shows that car No. 128300, bearing seals Nos. 16197–98 was received on April 5, 1934. It was stipulated that if George Howlett, a witness for plaintiff (petitioner), were to appear, he would testify that he was the deputy bailiff; that he conducts judicial sales on behalf of the bailiff; that he had been so employed for the past 12 years and was so employed on February 16, 1943; that pursuant to the special writ of execution and a levy made in accordance therewith on February 5, 1943, he held a sale on the premises of the garnishee; that he offered for sale and sold to the highest bidder for cash all right, title and interest of defendant in and to one carload of mixed brass in the possession of garnishee and described in warehouse receipt No. 587 issued by garnishee; that before holding the ''auction'' he did ex-

hibit the property to be sold to all persons present and did publicly announce that the property to be sold was open to public view and could be examined by all bidders; that he did not know the weight and was not selling by weight; that all he was selling was the right, title and interest in and to one carload of mixed brass ''there on exhibit before them''; that plaintiff ''bid the price of $5,500 therefor and it being the highest and best bid for cash I did sell said property to plaintiff for the sum of $5,500''; that plaintiff ''did pay said bid by paying our office the sum of $121 for our commission and costs''; that the additional sum of $2,125.46 was turned over to garnishee to satisfy its lien ''as a warehouse'' and the balance was paid ''by plaintiff giving a credit for $3,253.54 on account of its judgment in this action''; that the last levy was made on February 5, 1943 by William Klass, a deputy bailiff; that witness ''never took physical possession of the brass in question nor weighed the same, nor were we ever informed as to its weight''; that ''we merely took technical custody''; that ''at the time of the sale the property and bin holding the same were in the same condition as it was at the time of the levy herein on February 5, 1943.''  Garnishee's exhibit No. 1 purports to be a notice of sale by the bailiff.  It is dated February 5, 1943 and recites that on the 5th day of February 1943 the bailiff would offer for sale at public vendue all right, title and interest of the defendant in and to ''one (1) carload of mixed brass.''  As the parties appear to be in agreement that the sale actually took place the afternoon of February 16, 1943, we assume that there was a typographical error in the statement of the notice that the sale would be held on February 5, 1943 and that it was intended in the notice to describe the property as ''one (1) carload of mixed brass.''  On the face of the notice appears a receipt signed by the bailiff by Deputy Howlett as follows: ''Received of Benj. Harris & Co. Fifty Five

Hundred Dollars for all the right title and interest of the above named defendant to the within described property this 16th day of February, 1943.''

Julian S. Jackson, called by plaintiff as an adverse witness, testified that he was president of the garnishee and had been such for 25 years; that he remembered the carload of brass and was present when it was received at the warehouse; that the inbound tally sheet was in the handwriting of Mr. Starr, secretary of garnishee; that after the brass was received it was unloaded and put on a platform and remained on the platform from 1934 to 1937; that the car originated in Chicago and accumulated much demurrage; that his company paid whatever charges there were, plus demurrage; that garnishee did not weigh the brass; that the freight bill showed the weight as 100,025 pounds; that "we never checked to see if the freight bill was correct"; that they did not weigh the car in the warehouse; that the platform on which the brass was placed was a wooden platform located at the northwestern portion of the inside of the warehouse; that shortly after the brass arrived garnishee received word from the Bekins Van & Storage Company that it expected to negotiate the sale of the brass; that the sale did not develop; that then garnishee's employees covered the brass with heavy timbers and grain doors to protect it; and that the brass was covered up by the timbers and grain doors until the bailiff arrived. He testified further that when the bailiff arrived he tacked his sign on the platform above the brass; that garnishee then employed a carpenter to partition the brass in an inclosure; that the door of the inclosure containing the brass was locked and cleated so that no access could be had; that garnishee had the brass in his possession about three years before the attachment was served; and that garnishee locked the door of the inclosure containing the brass and sealed it.

Benjamin Harris, called as a witness by plaintiff, testified that he is the president of plaintiff corporation and that he was present at the bailiff's sale; that he turned to Mr. Jackson and said: ''Mr. Jackson, this does not look like 100,000 pounds of brass to me,'' and that Mr. Jackson answered: ''Well, it is all there''; that witness then said to Mr. Jackson: ''Were the seals intact when you unloaded the car?'', and Mr. Jackson answered: ''Yes.'' He stated that this conversation took place when the brass was being inspected after the door of the bin was opened. After inspecting the brass, the parties went upstairs because it was a cold day. Mr. Harris testified further that in the office he went over the matter again with Mr. Jackson, stating to him: ''Well, I am a little skeptical about the weight there''; that Mr. Jackson said: ''Well, it is all there''; that witness said: ''Now listen, are you certain now you have got the right seals on that car, the original seals on that car so that the car was not tampered with?'', and Mr. Jackson answered: ''Yes.'' Witness further testified that plaintiff manufactured ingot brass and that he had been in that business for 40 years; that during that period he personally bought and sold brass and that ''I did a volume of about four million dollars worth of business a year.'' Mr. Harris testified that the first time he appeared at garnishee's warehouse was in 1936. He recalled that there was ''a lot more brass there at that time than there was at this time''; that there was no shed around it in 1936; that there was a shed around it in 1943 and that Mr. Jackson opened the shed with keys; that a man knocked down some of the timbers with a crow bar; that witness asked the bailiff to sell 100,000 pounds of brass; that the bailiff told him he did not know anything about the weight; that witness saw the brass just before the sale; that he had 10 days' notice prior to the sale; that the only time he saw the brass after 1936 was at the time of the

sale; that he stated he did not "think it contained 100,000 pounds of brass. I could not tell exactly how much brass was there. It is a fact I told you that I did not think that half of the brass was there." He stated he made this statement to the attorney for the garnishee on their way downtown in an ·automobile after the sale; that he stated he was a little skeptical as to the weight and that the attorney assured him that Mr. Jackson was a very honorable man. Asked as to whether he was skeptical before the sale, Mr. Harris said: "I did not think there was 100,000 pounds there, but I could not judge the exact weight." He testified that in 1943 prior to the sale and after he looked at the brass he did not think there was the same amount as there was in 1936. Witness stated that at the scale in his plant at Chicago Heights they could unload and weigh a car containing 100,000 pounds of brass within 5 or 6 hours, and that on the scale in ·garnishee's warehouse it would take about a day and until 2 o'clock the following day. Mr. Harris testified that his company received all of the brass sold by the bailiff; that on the day of the sale it was cold downstairs where the brass was located and the parties asked the bailiff if the sale could be held upstairs; that the bailiff said he could not hold the sale in the office, that the parties would have to go downstairs where the material was located. Asked as to whether the bailiff stated he wanted the bidders to see the material, witness answered: "He might have, possibly;" that when he looked at the brass in 1936 he examined it with respect to quality; that he went to the warehouse in 1936 to check the brass as to quantity but that his main purpose in going there was to check it as to quality; that in 1936 it was his impression that there was 100,000 pounds of brass; that when he saw the brass in 1943 it did not contain as much as it contained in 1936; that the bailiff must have overheard his conversation with Mr. Jackson; that witness asked

Mr. Jackson: "Is it all there?", and that after that conversation the bailiff said: "I am going to sell this material as and where it is." He testified further that he examined the brass before he bought it and that when he bid on the brass it was his impression "it was not 100,000 pounds, but I thought I might be in doubt about it, and it is possible it might be there." Answering a question by the trial judge, Mr. Harris answered: "The only thing is judge, if I see 100,000 pounds of brass and I see 50,000 pounds and it is supposed to be 100,000 pounds there, I am kind of in doubt about it. That is why I questioned the weight at that time." In answer to a question as to whether if he saw two piles of brass, one of 100,000 pounds and one of 50,000 pounds, he would recognize the difference, he answered: "Yes." Asked specifically as to whether the pile of brass looked like 100,000 pounds to him in 1936, he answered: "Yes." Asked as to what it looked like in 1943, he answered: "50,000 pounds." Asked as to whether that was before the sale, he answered: "Yes, that is why I insisted Mr. Cohler [one of the attorneys for plaintiff] insert, that the sheriff put the weight in on that. I wanted some guarantee on the weight." He testified further that there was no competitive bid; that in behalf of the plaintiff he was the only bidder; that two or three days after the sale the garnishee procured a railroad car for plaintiff to transport the brass; that after the purchase he did not put a custodian in possession of the brass; that his company did not receive the brass until about a week after the sale; that the men started to load the brass on the railroad car two or three days after the sale; that the weight was the same when received by plaintiff after the bailiff's sale as it was when the bailiff sold the property; and that "there is no claim on that part." He testified as to the market value of the brass. Exhibits were introduced by plaintiff consisting of switching orders of the

Pennsylvania railroad, showing the weight as 100,025 pounds. The exhibits introduced in the last previous trial were also received in evidence. The inbound talley sheet, made up by garnishee dated April 5, 1934, shows the receipt of Santa Fe car No. 128300, described as "scrap metal (brass)." This exhibit has a space to designate the weight, but this space was not filled in. The first warehouse receipt issued described the merchandise as one carload of loose scrap brass, and the weight was not filled in. Receipt No. 1109 issued by garnishee on February 16, 1943 describes the property as "one carload of scrap brass above described." Above this description is the statement that "This warrant covers the same carload of brass as covered by Mitchell-Jackson, Inc. warehouse receipt No. 587." Another exhibit is a letter dated February 16, 1943, signed by the garnishee and addressed to the bailiff and plaintiff and approved by the bailiff and plaintiff, wherein the garnishee acknowledged receipt from the bailiff of its charges. This letter concludes: "It is understood and agreed between Benj. Harris & Company and us that no further warehouse charges and interest or expenses is to become payable until March 5, 1943, the storage charges, interests, costs and expenses having been paid in full up to that date, and further that we will load this brass into a car for you at a total cost to you of $50.00, and we are to afford you the opportunity of having a representative present at the weighing out of the brass, and further that you or either of you do not waive any rights which you may have with respect to the correctness of the amount of brass now in our possession." A letter dated March 11, 1943 from a representative of the Automobile Insurance Company of Hartford, Conn., addressed to garnishee, was introduced by plaintiff. From this letter it appears that the garnishee presented a claim for loss of brass which it asserted was covered by an insurance policy. The

agent states that "if the loss occurred while the property was at your warehouse it does not appear when that loss took place. The policy of insurance issued by the Automobile Insurance Company of Hartford, Connecticut, first became effective in July of 1937. Of course any matter arising prior to the effective date of the policy could certainly not fall to us for attention." The letter concludes: "With full reservation of any and all rights under our policy of insurance, we must therefore suggest that this matter is not one falling to us for attention under the insurance had on behalf of the warehouse at least until such time as you are in a position to show the exact date or dates when the loss, if any, took place."

Harry Sack, called by plaintiff, testified that he was the field man for Supreme Laboratory, "sworn weighers"; that he weighed the carload of brass when it arrived at plaintiff's plant after the bailiff's sale; that the car was sealed; that he broke the seals and that the brass weighed 46,732 pounds. John A. Graf, called by the garnishee, testified that he was an attorney; that at the time of the sale he was associated with the law firm representing the defendant during the previous trials; that pursuant to notice he appeared at the bailiff's sale; that on arrival the deputy bailiff announced he was there to make the sale; that the bailiff stated he would sell one carload of scrap brass "as is and whereas for cash to the highest bidder"; that the question arose as to whether the sale could be held in the office; that the bailiff insisted he must see the brass; that the entire group then went to the main part of the warehouse downstairs; that they approached a wooden bin with a door; that the door was nailed shut and cleated to the bottom with a two by four; that an employee of the warehouse succeeded in opening the door with a crow bar; that Mr. Harris then walked in and onto the pile of brass, picked up a few pieces and asked Mr. Jackson as to the weight of

the brass; that the latter said: "I don't know the weight of the brass. That is what we got when it came in here." Witness testified that Mr. Harris then stated that there did not appear to be one half of a carload of brass there in his opinion; that finally the bailiff called his sale and Mr. Harris's attorney bid the brass in for plaintiff; that plaintiff and Mr. Harris's attorney were insistent that the warehouse receipt show a weight on it; that Mr. Jackson said: "I don't know what the weight is. All that I can give is what appeared to be on the warehouse receipt, which is 'one carload of brass;' " that the question was also put to the bailiff if he would sell under the terms of the "way-receipt of the Santa Fe railroad and the bailiff said all he could sell was what was shown on his order, one carload of brass"; that the latter conversation with the deputy was prior to the sale. Asked whether he recalled hearing Mr. Jackson tell Mr. Harris that the car had come into the warehouse sealed, Mr. Graf answered, "No." Joel D. Johnson, called by the garnishee, testified that he had been employed there 14 or 15 years; that he was a checker of in and outgoing merchandise, also a laborer; that he was familiar with the custom of handling incoming and outgoing merchandise; that he recalled a carload of brass coming in about April 5, 1934 and he informed Mr. Jackson or Mr. Starr; that at that time they did not seem to know what was to be done with the contents of the car, so they let the car sit on the track for a day; that then Mr. Jackson told him to unload it and put it in the bin on the wooden platform; that he had a helper with him; that he inquired as to whether it was to be weighed or just unloaded; that Mr. Jackson told him "just to unload it, that it wasn't to be weighed"; that they unloaded the brass on the platform in a wooden shed with four bins; that they picked the largest bin for the brass because they did not know how much room it would take to store it; that working on and off it took

3 or 4 days to unload the brass; that the load of brass stayed on that platform in the bin from the day it came into the warehouse until it was loaded out; that it remained in the bin about a month when Mr. Jackson instructed witness and a helper to cover it with grain doors and heavy timbers; that the bailiff came to look the brass over; that after he put his sign up, Mr. Jackson had a carpenter partition off the bin containing the brass and a lock put on the door; that Mr. Jackson took the key with him; that the carpenter nailed the door up; that to the best of witness's recollection "that bin of the shed was nailed up and locked about 5 years"; that it was opened up on or about the date of the sale; that then Mr. Jackson asked him to open the door; that witness unlocked the door and with a crow bar pried the cleats from the bottom of the floor and the side of the door "because the side of the door was nailed into a two by four each side of the door"; that witness saw the brass when it came in and when it went out. In reply to the question: "Have you an opinion as to whether or not that is the same amount of brass that went out that came in?", he answered: "Without a doubt I think it was the same amount of brass that went out that came in, because I and my helper unloaded it." On cross-examination, he testified that a switch track comes into the warehouse; that the car came into the warehouse; that he did not remember whether it was sealed or not; that when they receive a car from the railroad with the seal broken he notifies the office; that he would not go into a car with the seal broken without notifying Mr. Jackson; that he did not see the freight bill; that his helper in unloading the car was J. B. Markus, who was not working for garnishee at the time of the trial; that the car was not filled when they unloaded it; that he could not estimate the weight of the brass as being 100,000 pounds when it arrived "but if somebody had asked me after we had finished I would have said it was

200,000 pounds''; that the car was not pulled out of the warehouse over night during the 3 or 4 days it was in the warehouse; that he did not recall making a record of the sealed brass; that if there was a seal on the car ''I would make a record of the seal number on it''; that if a car came into the warehouse on which the seals were broken he would have given a report of that to Mr. Jackson; that he would not have touched the car under any condition as long as the seal was broken; that he would not have touched it until some representative of the company came to examine the seal; that so far as he knew he would assume that the car arrived in good condition; that all he could remember is that ''we unloaded the car of scrap metal and if the seal was broken or if there were no seals on the car I would have made a report to the office''; that he did not make a report in his book ''so I assume there was no seal on the car''; that he had no record of the car; that there is no record in the book as to when the car arrived at the warehouse; that he does not remember why that car is not in the book; that witness had nothing to do with the inbound tally sheet as this was made up in the office; that that was the only car of bulk brass that witness ever unloaded; that the warehouse did not handle bulk brass; that ''I have no experience or possible practice by which I could give you or determine the weight of the car.'' Julian S. Jackson, recalled, testified that he did not at any time tell Mr. Harris that the cars were sealed when they came into the warehouse; that he did not make any admissions to him at any time; that there were 100,000 pounds of brass in the warehouse; that there was no request to weigh the brass at the time it was delivered to the warehouse; that he had been in the warehouse business for over 25 years; that the custom was not to weigh the merchandise until so requested by the owner or consignor; that if the merchandise is ordered weighed there is a charge therefor; that the

charge then and at the time of his testimony was "25% of the total of the carloading and loading up charge"; that there was no charge made for the weighing of the brass; that garnishee sent the Pennsylvania railroad a check covering demurrage and freight on the car; that before garnishee received the freight bill he was asked by the railroad whether garnishee would advance the freight and demurrage charges if the railroad put the car in the warehouse; that garnishee agreed to pay the charges regardless of what the rate was; that garnishee was only acting as an agent "for some unknown consignor"; that the freight bill is stamped "paid" on April 28, 1934; that from an examination of the freight bill it would seem that garnishee was charged freight on the car at the rate of 3¢ per 100 pounds; that the amount paid to the railroad was subsequently repaid by Bekins; that witness was not told that 100,000 pounds of brass "was coming into the warehouse"; that the warehouse charged $30 per month for storage, which is on a square foot basis.

W. G. Morgan, called by garnishee, testified that he had been in the merchandise storage business for 37 years. Asked as to the custom of warehouses, independent of any contract, for the handling of merchandise, he answered that there was a custom; that if the shipper ordered the merchandise weighed, the warehouse would weigh it, and if the shipper did not order it weighed, the warehouse would not weigh it; that there is a charge made for the weighing by the warehouse; that he would not furnish the costs of weighing a carload of brass unless requested; that if he agreed to take the merchandise into the warehouse on a flat rate this would not include weighing it in; that it is not necessary for the warehouseman to tell the shipper what the charges would be for weighing it in because the letter to him advising that the shipment would be accepted would inclose a document showing that there would be a weighing charge. Joseph H.

Horwich, attorney for respondent (garnishee) was called as a witness by the court and testified that after the sale, being driven downtown in Mr. Harris's automobile with Mr. Graf, Mr. Harris stated that he was skeptical about the amount of brass he had purchased at the sale; that witness told him he had known Mr. Jackson for some time and that to him he was always known as an honorable gentleman and fair in his dealings, and that "so far as the—as whatever brass might have come into the warehouse—I think that he should have the assurance that whatever Mr. Jackson represented to him as being there might have been there."

Mr. J. R. Cohler, one of the attorneys for plaintiff called as a witness by the court, testified that on the date appointed for the sale he arrived at the office of the warehouse; that present were Mr. Jackson, the bookkeeper in the office, Mr. Horwich, Mr. Graf and Mr. Harris; that the deputy bailiff arrived about 20 minutes later; that this bailiff was sent out by his superior to hold the matter in abeyance until another bailiff arrived; that about an hour after the time set for the sale Mr. Howlett, another deputy, arrived; that in the interim the parties were walking around and talking in individual corners; that when they went downstairs to be present for the sale, they all trailed out separately; that it would be physically impossible for Mr. Graf to have heard every conversation; that Mr. Harris looked in the bin and took a few steps in and fingered a few pieces; that one of the conversations he heard was that in which Mr. Harris stated that it did not look to him as if a full 100,000 pounds were there; that Mr. Jackson stated: "I can assure you the entire carload of brass that was delivered to us is there": that Mr. Harris stated: "Well, if you say it is all there, you should know"; that after the sale they went back to the office, which was upstairs; that it was a half hour to an hour from the time they arrived back in the office until the money was paid by

Mr. Harris; that Mr. Harris again stated in the office that he hoped Mr. Jackson was correct in his statement that all the brass was there; that in the presence of all the parties witness called his associate on the telephone and stated to him that Mr. Harris had expressed some doubt as to whether or not the brass was there and had been assured by Mr. Jackson that "all the brass or scrap, that is covered, that was originally covered by the warehouse receipt is still there"; that witness said: "Do you think we should go ahead with the sale and pay over all the money and rely on Mr. Jackson's statement?"; that witness had a further conversation on the telephone with his associate; that when it was concluded witness informed the various parties there, including Mr. Jackson, that his associate said "that you are a bonded warehouse and he thinks we are perfectly justified in relying upon your statement. I am willing to go through with it." Witness then stated that there were two reservations he wanted before paying over the money; one is that "this is not to be construed as any accord and satisfaction or settlement as far as any claim we might have against Mr. Jackson in case something should develop to show that the weights were not as you stated they are, that is, the same as the original warehouse receipts show. And, accordingly, when we made out the receipt for the money, the express statement was made in the receipt that Mr. Jackson does not waive, by Mr. Jackson on behalf of the Mitchell-Jackson Company, that neither the bailiff of the municipal court nor Benjamin Harris & Company waive any rights that they might have with respect to the correctness of the amount of brass in their possession"; that a new warehouse receipt was made out; that at first the warehouse receipt that was made out referred to a quantity of brass; that he stated he did not agree to that; that he insisted the new warehouse receipt expressly recite that it was the same carload of brass

that was covered by the original receipt; that accordingly the receipt then issued recited that it covered the same carload of brass as was covered by warehouse receipt No. 587; that at that time witness stated that "we were only consummating the transaction on the basis of Mr. Jackson's assurance that the same carload of brass was there as was originally covered by the original warehouse receipt"; and that Mr. Graf consented to do the typing of plaintiff's exhibit No. 15. Mr. Julian Jackson, recalled as a witness, testified that he never knew the amount of brass that was unloaded from the Santa Fe car; that this was the only car of brass they have had in the warehouse; that the warehouse had never referred to any quantity of brass; that it had always referred to it as "the lot of brass that was unloaded from the Santa Fe car." After the attorneys had argued the case, the court stated that he found that the car was delivered to the warehouse with the seals attached and unbroken; that garnishee actually received 100,025 pounds of brass; that it now produced only 46,732 pounds of brass; that the garnishee has not accounted for the lost brass; that he found no fault with the sale conducted by the bailiff and that the bailiff sold a carload of brass. He continued: "I therefore will confirm the sale, but I must hold Mitchell-Jackson, Inc. responsible for the lost brass." Garnishee objected to the form of the order presented, stating that plaintiff purchased the brass at the bailiff's sale at $5.50 per 100 pounds and that he was computing his damages on the basis of $6.10 per 100 pounds. In a colloquy before the trial judge at the time the judgment appealed from was entered it appears that the attorneys discussed some of the points that are raised on this appeal.

The attorney for the defendant stated that the parties were overlooking the fact that the judgment was in favor of defendant for the use of the plaintiff; that plaintiff would not be entitled to the surplus, if

any; that such surplus would be returnable to the defendant. At this juncture the court inquired of the attorney for plaintiff as to what his client was entitled to. He answered: "They get their right, judge, on the basis of our bid of $5,500. The bailiff has given them credit on the execution satisfied to the extent of the difference between $5,500 and the cash we advanced to the warehouse and the costs. They have got that credit. Now, all we can do now, all the court can do, is to put us in the position we would have been had the garnishee sold the brass to us. We are the only one who is suffering by the fact that we did not get the 53,000 pounds of brass. . . . We paid for that brass and we did not get it, so now we are getting a judgment for the value of that brass and the Western Smelting does not enter into it. They were not damaged by reason of the fact that we did not get the brass. We are still entitled to the same amount of our judgment, namely, the difference between $5,500 and the costs." The attorney for defendant then stated that no one had explained to him how the judgment would appear on the records of the court. The court then inquired of the attorney for plaintiff, "You are not getting the judgment here as actual plaintiff, are you?" The attorney for plaintiff answered: "We are getting the judgment as a bidder." The attorney then said: "Under the statute, which says, 'If the garnishee fails or neglects to turn over —'," and the court interrupted, stating: "You better think that over a little here so you will have a good judgment entered here. You are taking judgment here in this category, namely, I find the issues in favor of the defendant, Western Smelting & Refining for the use of Benjamin Harris, against Mitchell-Jackson, Inc., garnishee. That is just the same as though we were to enter judgment for the attaching plaintiff here. You are not in the class of an attaching plaintiff here." The court then said: "You are bidder at the sale. You claim you did not get the

merchandise bought.'' The attorney said: ''That is right. Maybe we could strike that out. Just strike Western Smelting & Refining Company for the use of.'' The court said: ''You may run into considerable controversy over that.'' The attorney stated that he debated it, that he first had it in with the words ''for the use of,'' and that he thought the court was right and ''we should strike that out.'' The court then inquired: ''You are asking me to give a judgment here as the attaching creditor?'', and the attorney answered: ''That is right.'' The attorney for defendant inquired, assuming that the garnishee paid the judgment of $3,250.87 to the clerk, what the clerk was to do with the money and what the docket would show. Plaintiff's attorney answered that the clerk would turn it over to the plaintiff. Plaintiff's attorney then struck out of the judgment order, which the court was requested to enter, the words ''for use of Benjamin Harris & Company, plaintiff.'' The court at this point, referring to the attorney for the defendant, stated: ''He contends, and properly so, that if you let it stand in this form, what he wishes to know is who is entitled to the over-value.'' The attorney for plaintiff responded: ''His point is well taken, but we are not attaching creditors. We are the bidders and since we are the bidders here it should be in favor of us. This order is absolutely correct now. We had it this way first.'' In this colloquy the attorney for plaintiff further insisted that plaintiff appeared as bidder and purchaser. The court further stated there would be a finding for defendant and for the bailiff and that the petition would be dismissed as to the defendant and bailiff.

The first point presented by the garnishee is that the property of a defendant in the possession of a warehouseman served with a writ of attachment becomes *custodia legis* in the possession of the attaching officer, whose duty it is to keep and retain the property

in his possession or under his control to abide the judgment or order of the court; that the attaching officer may place the attached property in the hands of a receiptor or bailee for safekeeping; and that no action can be maintained by an attaching creditor against a custodian, receiptor or bailee for hire of an attaching officer for interfering in any manner with the property in the custody of the officer executing the writ, such right of action being in favor of the attaching officer, which he alone can enforce. Plaintiff replies that when a garnishee has goods or chattels of defendant in his possession, he is required to deliver them to the officer who holds the execution in favor of plaintiff in the attachment suit; that when a garnishee refuses or neglects to deliver goods or chattels of defendant in his possession, when required to do so by the court or bailiff, the court may enter judgment against garnishee for the value of said goods or chattels; and that by the bailiff's sale title to the carload of brass vested in plaintiff. We call attention to sections 20, 24 and 25 of the Garnishment Act (secs. 20, 24 and 25, ch. 62, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 109.303, 109.307, 109.308]):

"20. When any garnishee has any goods, chattels, choses in action, or effects other than money, belonging to the defendant, or which he is bound to deliver to him, he shall deliver the same or so much thereof as may be necessary, to the officer who shall hold the execution in favor of the plaintiff, in the attachment suit or judgment, which shall be sold by the officer, and the proceeds applied and accounted for in the same manner as other goods and chattels taken on execution.

"24. When it shall appear that any garnishee has in his hands, or under his control, any goods, chattels, choses in action or effects, belonging to or which he is bound to deliver to the defendant, with or without condition, the court or justice of the peace may make any and all proper orders in regard to the delivery

thereof to the proper officer, and the sale or disposition of the same, and the discharging of any lien thereon, and may authorize the garnishee to sell any such property, or collect any choses in action, and account for the proceeds thereof; or, if the proceeding be in a court of record, the court may appoint a receiver to take possession and sell, collect or otherwise dispose of the same, and make all orders in regard thereto which may be necessary or equitable between the parties.

"25. If any garnishee refuses or neglects to deliver any goods, chattels, choses in action or effects in his hands when thereto lawfully required by the court or justice of the peace or officer having an execution upon which the same may be received, [sold], he shall, if the proceeding be in a court of record, be liable to be attached and punished as for a contempt, or the court may enter up judgment for the amount of the plaintiff's judgment, and award execution thereon against the garnishee; or, if the proceeding be before a justice of the peace, be liable to the plaintiff for full amount of his judgment against the defendant, and judgment may be entered against him therefor."

Sec. 43, ch. 77, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 107.193], provides that when an officer shall levy an execution on personal property he shall provide for the proper care and storage thereof until the same shall be replevied, sold or discharged from such execution, and he shall have reasonable compensation therefor. Sec. 51 [Jones Ill. Stats. Ann. 107.201] of the same act provides for at least 10 days previous notice of a sale by posting, and sec. 53 [Jones Ill. Stats. Ann. 107.203] provides that the officer making the sale shall in the return of the execution particularly describe the goods sold, and the sum for which each article was sold, and that if he is guilty of fraud in the sale or return he shall be liable in any proper action for five times the amount of the actual dam-

age sustained by reason of such fraud. It will be observed that sec. 20 of the Garnishment Act provides that when a garnishee has in his possession any property belonging to the defendant, he shall deliver the same, or so much thereof as may be necessary, to the officer holding the writ, and that the proceeds shall be applied and accounted for in the same manner as other goods and chattels taken on execution. The answer of the garnishee filed February 10, 1937 stated that it had in its possession ''one carload of copper.'' As all the briefs speak about the commodity as being brass, we assume that the statement in the answer appearing in the record that it was a carload of ''copper'' is a typographical error. The statement that garnishee had in its possession one carload of copper (brass) was not contested. Secs. 24 and 25 of the Garnishment Act provide that when it shall appear that any garnishee has in his hands or under his control any property belonging to or which he is bound to deliver to the defendant, the court may make any and all proper orders in regard to the delivery thereof to the proper officer, and the sale or disposition of the same, and make all orders in regard thereto as may be necessary or equitable between the parties. This section is not applicable to the instant case because the garnishee surrendered the carload of brass to the bailiff on January 9, 1937. Sec. 25 is not applicable for the same reason. There was no neglect or refusal to deliver the chattels for sale under an execution. If there was a contention before the court prior to the sale that the garnishee had not delivered up to the bailiff all of the property of the defendant under its control, the court could have inquired into the matter, on the filing of proper pleadings, under the provisions of secs. 20, 24 and 25. This was not done. There is no dispute that at the time of the sale the bailiff sold the carload of brass which he exhibited. Sec. 14, ch. 11, Ill. Rev. Stat. 1943 [Jones Ill.

Stats. Ann. 109.048], provides that the officer serving a writ shall take and retain the custody and possession of the property, to answer and abide the judgment of the court. To maintain the lien of attachment the officer serving the attachment writ must take, retain and continue in the legal custody of the property. *Hardin v. Sisson,* 36 Ill. App. 383. The record shows that on January 9, 1937 the bailiff, through his deputy, served a writ of attachment upon garnishee and made his return thereon accordingly. The evidence shows that after serving the writ, the deputy put up his sign, and a carpenter, under the direction of Mr. Jackson, partitioned the brass in the bin, locked and nailed the door, and that there was no access to the bin until February 16, 1943, when the property was sold by a deputy bailiff. During all of this time the property was in the custody of the bailiff. From the time the carload of brass was delivered to the warehouse on April 5, 1934 until the bailiff took possession on January 9, 1937, the warehouse was the bailee of the brass and the consignor was the bailor. The original warehouse receipt was issued on April 5, 1934 to the Bekins Van & Storage Company. From January 9, 1937 until the sale on February 16, 1943 the bailiff was the custodian of the property. When he served the writ, he permitted the garnishee to retain the brass as receiptor or bailee for safekeeping. Garnishee received the sum of $30 per month for storage as per the mandate of the municipal court from the bailiff out of the proceeds derived from the sale of the brass, as shown by the bailiff in his "return on Levy Sale and Application of Proceeds." Under the provisions of sec. 43, ch. 77, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 107.193] it was the duty of the bailiff to provide for the proper care and storage of the brass and he was entitled to compensation therefor. An officer who attaches personal property may in the absence of a statutory provision to the contrary, surrender the

custody of the property to a bailee for hire. (7 C. J. S., sec. 296, p. 481.) In the instant case the warehouseman became the receiptor or bailee for hire of the bailiff on January 9, 1937. This relationship continued until February 16, 1943, when the brass was sold. At the time of the sale plaintiff was the highest bidder. Its petition was filed as a bidder and not as plaintiff. If between January 9, 1937 and February 16, 1943, through failure on the part of the warehouseman to exercise the degree of care required, some of the brass was removed from the bin, the bailiff could bring an action against the warehouseman to recover the value of the merchandise. In *Nichols v. Patten,* 18 Me. 231, the court said (238):

"To preserve an attachment when made, the officer must by himself or his agent retain his control and power of taking immediate possession in all those cases in which the property is capable of being taken into actual possession. . . ."

See also *Keith v. Ramage,* 66 Mont. 578; *Schaeffer v. Marienthal, Lehman Co.,* 17 Ohio St. 183, 184; *Claremont Gas Light Co. v. Wooster,* 91 N. H. 439.

Garnishee insists that the rule of *caveat emptor* applies generally to all judicial sales whether made by marshals, bailiffs, deputies, constables or special commissioners, and not only discharges the officers or others who make the sales but protects the parties in interest under the executions from implied warranties. Plaintiff asserts that the rule of *caveat emptor* is not involved in the case at bar; that plaintiff as the purchaser at the bailiff's sale had full knowledge that garnishee had in its possession 100,025 pounds of brass belonging to defendant; that plaintiff also knew that the court had ordered the garnishee to deliver the carload of brass to the bailiff to be sold on special execution; that at the sale bailiff sold all right, title and interest of defendant in and to the carload of brass in

the possession of garnishee; that plaintiff knew that under the law garnishee was required to deliver to the purchaser at the bailiff's sale the brass purchased at the sale; that plaintiff is not making any complaint as to the title to the brass or as to the quantity in garnishee's possession at the time of the sale; that plaintiff is merely trying to gain possession of the 53,293 pounds of brass which it purchased at the bailiff's sale, but which garnishee has failed or refused to deliver to the plaintiff; that the evidence proves conclusively that garnishee, in its capacity as a public warehouse, received 100,025 pounds of brass belonging to defendant; that in this proceeding garnishee contends that it is unable to produce the said 53,293 pounds of brass, and is unable to explain its loss or disappearance; and that the garnishee, in order to induce plaintiff to make its bid at the sale, specifically represented to plaintiff that 100,025 pounds of brass were still in the possession of the garnishee at the date of the sale, and that by the bailiff's sale title to the carload of brass vested in plaintiff. The evidence shows that when deputy bailiff Howlett came to conduct the sale he insisted upon viewing the brass. The evidence is undisputed that it was then in the same bin and apparently in the same condition and quantity as when the original levy was made on January 9, 1937. Mr. Harris, president of plaintiff corporation, who viewed the brass at the warehouse in 1936, before it was put in the bin, felt at the time of the bailiff's sale that there was not 100,025 pounds of brass in the pile. He made the statement that there was only one half that poundage there. The bailiff declined to sell the brass by pounds. He sold only what he had. Mr. Harris saw what he was buying in behalf of plaintiff. He urged Mr. Jackson, president of the corporation, to show the poundage on the new receipt. The warehouse issued a receipt to plaintiff describing the merchandise as "one carload scrap brass above described," the reference being to the lan-

guage that "this warrant covers the same carload of brass as covered by Mitchell-Jackson, Inc., warehouse receipt No. 587." In our opinion filed March 18, 1942 we stated: "This carload of scrap yellow brass was purchased for $3,751.19 and weighed 100,025 pounds." In the previous opinions there was no dispute about the actual shipment of the brass and damages were determined by computation from the number of pounds the defendant agreed to deliver. There was no dispute as to whether there actually were 100,025 pounds of brass in the warehouse until after the bailiff's sale. At the time the brass was delivered to the warehouse on April 5, 1934 the consignor did not request that it be weighed. The custom was not to weigh the merchandise unless requested. Where requested, the consignor or other interested party was required to pay for the weighing. The original warehouse receipt No. 587 described the merchandise as "one carload loose scrap brass." Although there was a space to insert the weight, this space was not filled in. The fact that in the letter from garnishee to the bailiff and plaintiff dated February 16, 1943, apparently given at plaintiff's request, the statement is made that "you or either of you do not waive any rights which you may have with respect to the correctness of the amount of brass now in our possession" constitutes strong evidence that at the time of the sale plaintiff knew that the bailiff did not sell 100,025 pounds of brass. The fact that the second warehouse receipt, issued after the sale, does not recite the poundage, shows clearly that the warehouse was insisting on its position that it had in its possession only a carload of brass. A careful reading of the record convinces us that there is no warrant for finding that the garnishee, Mr. Jackson, induced Mr. Harris, for plaintiff, to make the bid on the representation that there were 100,025 pounds of brass. All Mr. Jackson said was that the brass which was received at the warehouse in the car on April 5, 1934

was the brass which was sold by the bailiff on February 16, 1943. Prior to the sale Mitchell-Jackson, Inc., had no contractual relations with plaintiff. It was merely a party to a law suit. The garnishee was not selling the brass. The bailiff was selling the brass. Under the law, it could retain possession of the brass, after the sale, until its lawful charges were paid. The attachment writ became effective from the time it was served on January 9, 1937. It is undisputed that the brass which was placed in the bin on that date remained there until the sale. It is clear that what plaintiff purchased at the sale was what the bailiff sold and what the bailiff sold was the property of defendant that was in the garnishee's possession from the time of the service of the original attachment on January 9, 1937 to the time of the sale on February 16, 1943.

Plaintiff states that it is not making any complaint as to the title of the brass, or as to the quantity in garnishee's possession at the time of the sale, but that it is merely trying to gain possession of the 53,293 pounds of brass which it purchased at the sale and which garnishee has failed or refused to deliver to the plaintiff. We are unable to understand how the plaintiff as the high bidder could purchase more brass than the bailiff was selling. If a bailiff levied an execution on 5 automobiles and he had only 3 at the time of the sale, it is plain that he could sell only 3 automobiles. The law is well settled in this State that the rule of *caveat emptor* applies to judicial sales. In *England v. Clark,* 5 Ill. (4 Scam.) 486, our Supreme Court said (489):

"The general rule of *caveat emptor* applies to the sale of lands; to all judicial sales, whether made by marshals, sheriffs, their deputies, constables or special commissioners appointed by the courts; and the rule not only discharges the officers or others who may make the sale, but equally protects from an implied warranty the plaintiff and defendant in execution. The

rule is founded in public policy, but there are exceptions to it, which in no way contravene that policy."

See also *Grundy County Nat. Bank v. Rulison,* 61 Ill. App. 388. We are of the opinion that the rule of *caveat emptor* is applicable to the case at bar. The plaintiff as the high bidder received the property sold by the bailiff. There is no contention that between the time of the sale and the delivery of the brass there was any diminution. After the purchase for the first time plaintiff decided to weigh the brass and then found it weighed 46,732 pounds. It is strange that plaintiff did not cause the brass to be weighed before it bid. The sale could have been postponed for this purpose. If the plaintiff proceeded on the theory of mutual mistake, or that fraud was committed, it might have sought to set the sale aside. The petition filed did seek to vacate and hold for naught the sale and the partial satisfaction of judgment. In our opinion that was proper procedure and the court would have had the duty of deciding whether or not to set aside the sale and expunging from the record the partial satisfaction of the judgment. If plaintiff succeeded under such procedure there could have been another sale and if the successful bid were lower, the judgment debtor would be credited only with the amount remaining after costs and expenses were paid. However, instead of setting aside the sale, the court confirmed it. Plaintiff, as the successful bidder, did not file a notice of cross-appeal or assign cross-errors because of this action of the court. In the instant proceeding the court found in favor of the defendant and the bailiff and dismissed the petition as to them. We are of the opinion that there is no basis in the record for entering a judgment against the garnishee.

Garnishee contends that where the attaching officer is released, this operates to release the liability of the receiptor or bailee on his receipt. The warehouseman was bailee for the bailiff in lieu of a custodian. On

May 5, 1943 the petition was dismissed as to the bailiff and he was discharged. We agree with the garnishee that in discharging the bailiff the court should have discharged the warehouseman. *Carter, Carter & Meigs Co. v. Stewart Drug Co.,* 115 Me. 289, 98 Atl. 809; *Stewart v. Stewart Drug Co.,* 117 Me. 84, 102 Atl. 823; *Sweeney v. Haggerty,* 87 N. H. 232; *Polley v. Hazard,* 70 Vt. 220.

Finally, garnishee urges that satisfaction of the original judgment in whole or in part discharges a garnishee, bailee or receiptor from the liability of his undertaking, *pro tanto.* Plaintiff states that satisfaction of a judgment is only in the nature of a receipt, subject to explanation, and will not operate to release the garnishee of liability where garnishee refuses to turn over the property attached and sold by the bailiff, and that garnishee will be unjustly enriched unless it is required to account for the other one half carload of brass. The record shows that the bailiff returned the execution satisfied on February 16, 1943 for $3,253.54 in favor of the defendant, leaving a deficiency in favor of plaintiff in the sum of $47.35, plus interest at 5 per cent on $3,300.89 from January 29, 1941. On May 5, 1943 the court entered a judgment against the garnishee for $3,250.87 and dismissed the petition as to defendant and discharged it from liability. This is the point which was urged by the attorney for the defendant at the time the parties were settling the judgment order to be entered by the trial judge. According to the record plaintiff's judgment has already been satisfied to the extent of $3,253.54. Plaintiff proceeded in the instant case not on the basis that he was filing a new suit as a plaintiff, but that he was appearing as a successful bidder. This clearly appears from the colloquy at the time the parties were discussing the form of the judgment order to be entered. The sale of the brass was held in order to apply the proceeds in payment of the costs (including storage charges) and the

judgment. This was done and the judgment was credited accordingly. We quote from 34 C. J. S. (Judgments) sec. 1105, p. 719:

"Where property of the debtor is sold on execution and the sale stands, the judgment is satisfied to the extend of the net proceeds of the sale. The judgment under which the sale is made, as distinguished from some other judgment, is extinguished by the sale on execution and the payment of the amount bid, when sufficient to cover the amount due and costs. It is sufficient for this purpose if the money is actually collected by the sheriff or paid into court. Also, the judgment is satisfied where plaintiff receipts the execution even though as a matter of fact, he gives credit and the purchaser does not perform his obligation. If the judgment creditor himself becomes the purchaser at the sale, the judgment is satisfied in full if he bids the whole amount due him, otherwise, *pro tanto*."

Plaintiff contends that the statute expressly permits the entry of a judgment against a garnishee who fails or refuses to deliver the property as required. As hereinbefore pointed out, that statute is not applicable to the facts of this case. So long as the sale stands we do not see how the court can refuse to credit the judgment debtor with the net amount received by the bailiff after the payment of the costs and expenses. Plaintiff urges that "even if it be admitted for the sake of argument only that the satisfaction of judgment should not stand for the full amount while the plaintiff seeks at the same time to recover against the garnishee, it by no means follows that the garnishee can escape liability for its wrongful acts"; and that it is clear that the court has the inherent right to modify, qualify or otherwise change the satisfaction entry to reflect the true facts and thus adjust the equities of the parties. This court does not have that power. In addition to the garnishee, the defendant

and bailiff are very much interested. The petition was dismissed as to them. As the record stands, the defendant has credit on its judgment for the amount bid at the sale less the costs and charges. No cross-appeal was filed by plaintiff, nor has plaintiff assigned cross-errors. Neither the defendant nor the bailiff has appeared or filed briefs in this court. In view of this record we do not feel that we have any authority to disturb the record of the trial court. Because of these views, the judgment of the municipal court of Chicago in favor of Benj. Harris & Company, plaintiff, and against Mitchell-Jackson, Inc., garnishee, is reversed, and judgment for costs is entered here for Mitchell-Jackson, Inc., and against Benj. Harris & Company.

*Judgment reversed and judgment here.*

HEBEL, P. J., and KILEY, J., concur.